## FIRST NATIONAL BANK IN ST. LOUIS *v.* STATE OF MISSOURI AT THE INFORMATION OF BARRETT, ATTORNEY GENERAL.

ERROR TO THE SUPREME COURT OF THE STATE OF MISSOURI.

No. 252. Argued May 7, 1923; restored to docket for reargument May 21, 1923; reargued November 21, 22, 1923.—Decided January 28, 1924.

1. National banks are subject to state laws that do not interfere with the purposes of their creation, tend to destroy or impair their efficiency as federal agencies, or conflict with the laws of the United States. P. 656.
2. National banks can exercise only the powers expressly granted by federal statutes and such incidental powers as are necessary to the conduct of the business for which they are established. *Id.*

---

640                Argument for Plaintiff in Error.

3. Under the National Bank Law, power to establish branches is
   withheld. P. 657. Rev. Stats., §§ 5134, 5190, 5138.
4. The power cannot be sustained as an incidental power, under Rev.
   Stats., § 5136; for the mere multiplication of places where the
   powers of a bank may be exercised is not a necessary incident of
   the banking business; and, moreover, a power which the statute,
   by fair construction, denies, cannot exist incidentally. P. 659.
5. A state statute prohibiting branch banks is valid in application to
   a national bank; for it does not frustrate the purpose for which
   the bank was created, or interfere with the discharge of its duties
   to the Government, or impair its efficiency as a federal agency.
   *Id.*
6. The prohibition may be enforced by the State, by such form of
   procedure as the State may deem appropriate,—in this case by an
   information in the nature of *quo warranto.* P. 660.

297 Mo. 397, affirmed.

ERROR to a judgment of the Supreme Court of Missouri,
ousting the plaintiff in error from operating a branch
bank, in a proceeding in the nature of *quo warranto,* in-
stituted by the State at the information of her Attorney
General. For the order restoring the case to the docket
for reargument, see 262 U. S. 732.

Mr. *Frank H. Sullivan* and *Mr. C. A. Severance,* with
whom *Mr. Frank B. Kellogg, Mr. James C. Jones, Mr. Lon
O. Hocker, Mr. Eugene H. Angert* and *Mr. Wm. J. Hughes*
were on the brief, for plaintiff in error.[1]

I. The State is without power to bring proceedings to
question compliance by a national bank with its charter.

National banks are instrumentalities of the National
Government. *McCulloch* v. *Maryland,* 4 Wheat. 316;
*First National Bank* v. *California,* 262 U. S. 366.

A proceeding of this kind is the prerogative of the
sovereign which created the corporation. *Ames* v. *Kansas,*
111 U. S. 460; *Territory* v. *Lockwood,* 3 Wall. 236; *Mc-*

---

[1] The case was argued, at the first hearing, on behalf of plaintiff in
error, by *Mr. Sullivan.* *Messrs. Jones, Hocker, Angert* and *Hughes*
were also with him on the brief.

*Clung* v. *Silliman,* 6 Wheat: 598; *First National Bank* v. *Union Trust Co.,* 244 U. S. 427; *Van Reed* v. *People's National Bank,* 198 U. S. 554; *Massachusetts* v. *Mellon,* 262 U. S. 447; *Terrett* v. *Taylor,* 9 Cr. 51; *California* v. *Pacific R. R. Co.,* 127 U. S. 1; *Hale* v. *Henkel,* 201 U. S. 43; *McCulloch* v. *Maryland,* 4 Wheat. 316; *Osborn* v. *Bank of United States,* 9 Wheat. 738; *Farmers Bank* v. *Minnesota,* 232 U. S. 516.

The proper relations between our dual governments make it impossible that a State should possess such power. Authorities *supra; Ableman* v. *Booth,* 21 How. 518; *Tarble's Case,* 13 Wall. 405; *Tennessee* v. *Davis,* 100 U. S. 257.

The enforcement of charter limitations on national banks is denied to citizens because it is the function of the National Government. *National Bank* v. *Matthews,* 98 U. S. 621; *National Bank* v. *Whitney,* 103 U. S. 99; *Reynolds* v. *Crawfordsville Bank,* 112 U. S. 405.

Such a power cannot exist in the States without a sacrifice of the uniformity which was one of the purposes of the National Bank Act. *Easton* v. *Iowa,* 188 U. S. 220.

Congress, in conferring jurisdiction on courts of the States over actions against national banks, has reserved actions of this type to the general government, and jurisdiction thereof to the national courts. C. 58, § 55, 12 Stat. 680; c. 106, § 56, 13 Stat. 116; Jud. Code, § 24 (16); c. 80, § 300b, 18 Stat. 320; c. 290, § 4, 22 Stat. 163; c. 373, § 4, 24 Stat. 554.

State courts have denied the power here under consideration. *State* v. *Curtis,* 35 Conn. 374; *State* v. *Bowen,* 8 S. Car. 400; *Harkness* v. *Guthrie,* 27 Utah, 248, affd. 199 U. S. 148; *State* v. *Cincinnati, etc., Ry. Co.,* 47 Oh. St. 130.

II. A state statute attempting to limit or define the powers of a national bank is invalid.

It is only general legislation of the State which is binding on national banks. *National Bank* v. *Commonwealth,* 9 Wall. 353; *Davis* v. *Elmira Savings Bank,* 161 U. S. 275;

*McClellan* v. *Chipman,* 164 U. S. 347; *First National Bank* v. *California,* 262 U. S. 366.

The Congress, having defined the powers of the bank, has, in so doing, by implication, excluded those not conferred, and hence occupied the entire field of legislation on that subject. *Thomas* v. *Railroad Co.,* 101 U. S. 71; *Pennsylvania R. R. Co.* v. *St. Louis, etc., R. R. Co.,* 118 U. S. 290; *Central Transp. Co.* v. *Pullman's Car Co.,* 139 U. S. 24; *First National Bank* v. *National Exchange Bank,* 92 U. S. 122.

State legislation, in definition of the powers of a national bank, necessarily conflicts with the regulations, express or implied, prescribed by Congress. *Easton* v. *Iowa,* 188 U. S. 220; *Farmers' & Mechanics' Bank* v. *Dearing,* 91 U. S. 29; *California Bank* v. *Kennedy,* 167 U. S. 362; *First National Bank* v. *California, supra.*

State statutes defining the manner in which national banks shall exercise their franchises enjoyed from the general government are invalid because the sovereignty of the State does not so far extend to them. *McCulloch* v. *Maryland, supra; Osborn* v. *Bank of United States, supra.*

Such a statute is the exercise of visitatorial power which pertains exclusively to Congress, and which Congress has, in terms, forbidden to state legislatures. *Guthrie* v. *Harkness,* 199 U. S. 148; Rev. Stats., § 5241; c. 6, § 21, 38 Stat. 272.

III. The bank, in the exercise of its corporate functions, is not limited to a single building in the city in which it does business. Banking is a natural right, not a privilege. *Bank of Augusta* v. *Earle,* 13 Pet. 517; *Bank of California* v. *San Francisco,* 142 Cal. 276; *Curtiss* v. *Leavitt,* 15 N. Y. 9.

Except as restrained by the legislature, a corporation may conduct its business at any point within the jurisdiction of the sovereign which gives it being. 2 Fletcher, Corporations, c. 21, § 806, and cases cited; *Lloyd's Trustees* v. *Lynchburg,* 113 Va. 627.

The function here in question is within the incidental powers of a national bank unless forbidden by Congress. *First National Bank* v. *National Exchange Bank*, 92 U. S. 122; *Green Bay R. R. Co.* v. *Union Steamboat Co.*, 107 U. S. 98.

Revised Statutes, § 5134, deals only with the city, town or village designated in the charter, and not with a place of business within the city, town or village. *McCormick* v. *Market Bank*, 162 Ill. 108; s. c. 165 U. S. 538.

Revised Statutes, § 5190, does not limit a national bank to a single office for the transaction of its business. *Merchants' Bank* v. *State Bank*, 10 Wall. 604; Rev. Stats., § 5136; c. 290, 22 Stat. 162; Century Dictionary, article " a " or " an "; *United States* v. *Oregon & California R. R. Co.*, 164 U. S. 526; *United States* v. *Perry*, 133 Fed. 841; *National Union* v. *Copeland*, 171 Mass. 257; *State* v. *Martin*, 60 Ark. 334; *Commonwealth* v. *Watts*, 84 Ky. 537.

IV. There has been no departmental construction which can be permitted to control the construction of the statute. *Studebaker* v. *Perry*, 184 U. S. 258; *United States* v. *Pugh*, 99 U. S. 265; *Hahn* v. *United States*, 107 U. S. 402; *Swift Co.* v. *United States*, 105 U. S. 691; *United States* v. *Graham*, 110 U. S. 219; *Merritt* v. *Cameron*, 137 U. S. 542; *United States* v. *Healey*, 160 U. S. 136; *Louisville & Nashville R. R. Co.* v. *Kentucky*, 161 U. S. 677; *Wisconsin Central R. R. Co.* v. *United States*, 164 U. S. 190.

V. There has been no binding congressional interpretation. Rev. Stats., § 5155; c. 71, 27 Stat. 33; c. 864, § 21, 31 Stat. 1444; c. 156, 26 Stat. 62; Act of April 26, 1922, c. 147, 42 Stat. 400; *Postmaster-General* v. *Early*, 12 Wheat. 136; *United States* v. *Claflin*, 97 U. S. 546; Endlich, Interpretation of Statutes, (ed. 1888), § 372.

*Mr. Solicitor General Beck,* with whom *Mr. George Ross Hull* and *Mr. Charles W. Collins* were on the brief, for the United States, by special leave of Court, as *amici curiae.*

The National Bank Act vests in the Comptroller of the Currency power to supervise all the operations of national banks, and specifically authorizes him to bring suit in the United States courts for the forfeiture of the charter of any national bank which violates any provision of the act and thus exceeds its corporate powers. Rev. Stats., § 5239. Revised Statutes, § 5240, as amended by the Federal Reserve Act, § 21, 38 Stat. 271, intends that the Comptroller shall have the " visitatorial " power to enforce observance of the National Bank Act.

These proceedings are an obvious attempt to exercise visitatorial powers.

The United States alone may inquire by *quo warranto* whether a national bank, in operating as such, has acted in excess of its corporate powers.

The distinction between a pretended corporation and a legal corporation which misuses its franchise is clear; for the power to restrain the abuse of a corporate privilege is essentially visitatorial, and, to subject a federal instrumentality to the visitatorial powers of a State is to subject a federal instrumentality to the rule of two masters—and this our system of government forbids. No other case has come to our attention wherein one sovereign has successfully attempted by *quo warranto* in its own courts to define the limits of a franchise granted by another. *Standard Oil Co.* v. *Missouri,* 224 U. S. 270, distinguished. This bank is in Missouri by the paramount authority of the United States. *McCulloch* v. *Maryland,* 4 Wheat. 316.

The ancient writ of *quo warranto* was a high prerogative writ in the nature of a writ of right for the sovereign, against one who usurped or claimed any office, franchise, or liberty of the Crown, to inquire by what authority he claimed the right. 3 Black. Com., 262; High, Extraordinary Legal Remedies, 3d ed., 544. The sovereign alone might inquire who should hold a franchise, how it should be exercised, when its limits had been exceeded, or when

its exercise had been abandoned. The writ was a purely civil proceeding. In course of time it was superseded by the speedier remedy of an information in the nature of *quo warranto. Territory* v. *Lockwood,* 3 Wall. 236. This proceeding was criminal in character and led to judgment, not only of ouster, but of a fine for the usurpation. *Standard Oil Co.* v. *Missouri,* 224 U. S. 270. In either proceeding, however, the king was the person aggrieved, and it was upon his initiative that the actions were begun.

When our Republic was formed with a dual sovereignty, the Nation and the constituent States, each in their respective spheres, succeeded to this prerogative of the Crown. The question as to what authority may inquire into the exercise of a federal office or franchise is not entirely new in this Court. *Wallace* v. *Anderson,* 5 Wheat. 291; *Territory* v. *Lockwood,* 3 Wall. 236. And see *State* v. *Curtis,* 35 Conn. 374. The reasoning of these opinions seems clearly applicable to the case at bar and conclusive upon the question of the power of the State of Missouri. Indeed, no other authority seems required than *McCulloch* v. *Maryland.*

National banks organized under the National Bank Act are instruments designed to be used to aid the Federal Government in the administration of its powers. *Davis* v. *Elmira Savings Bank,* 161 U. S. 275; *McCulloch* v. *Maryland,* 4 Wheat. 316; *Osborn* v. *Bank of United States,* 9 Wheat. 738.

A state court cannot impede or suspend the operation of a federal instrumentality upon the ground that the act of Congress under which the instrumentality is operating is unconstitutional, or does not confer the power sought to be exercised, for it is not within the power of the State to stay the operations of the Federal Government. *Ableman* v. *Booth,* 21 How. 506; *Tarble's Case,* 13 Wall. 397. The judicial control of the agency is within the exclusive jurisdiction of the Federal Government. *Tennessee* v. *Davis,* 100 U. S. 257.

Many cases have arisen where persons held by the state authorities have been discharged by the federal courts on the ground that the act complained of was done under authority of the United States or the process of its courts, and that the state court was, therefore, without jurisdiction. *In re Neagle,* 135 U. S. 1; *United States* v. *Fullhart,* 47 Fed. 802; *Ex parte Conway,* 48 Fed. 77; *Kelly* v. *Georgia,* 68 Fed. 652; *In re Waite,* 81 Fed. 359; affd. 88 Fed. 102; *In re Lewis,* 83 Fed. 159; *In re Thomas,* 82 Fed. 304; affd. 87 Fed. 453; 173 U. S. 276; *In re Weeks,* 82 Fed. 729; *In re Comingore,* 96 Fed. 552; affd. 177 U. S. 459; *In re Fair,* 100 Fed. 149; *Anderson* v. *Elliott,* 101 Fed 609; *United States* v. *Fuellhart,* 106 Fed. 911; *In re Turner,* 119 Fed. 231; *In re Matthews,* 122 Fed. 248; *In re Laing,* 127 Fed. 213; *Ex parte Gillette,* 156 Fed. 65; *Drury* v. *Lewis,* 200 U. S. 1; *Hunter* v. *Wood,* 209 U. S. 205; *Pundt* v. *Pendleton,* 167 Fed. 997. The principle clearly applies to national banks. *McCulloch* v. *Maryland, supra.*

Congress has vested no power in the state courts, by *quo warranto* or otherwise, to control the operations of national banks. On the contrary, it has expressly forbidden it. Act of July 12, 1882, c. 290, § 4, 22 Stat. 163; Act of August 13, 1888, c. 866, § 4, 25 Stat. 436; Rev. Stats., § 5239; *Leather Manufacturers' Bank* v. *Cooper,* 120 U. S. 778; *Petri* v. *Commercial Bank,* 142 U. S. 644; *Guthrie* v. *Harkness,* 199 U. S. 148.

If the state law prescribes a penalty for the exercise of any power by a national bank which is not authorized by the laws of the United States, the national bank is not subject to such penalty. See *Farmers' & Mechanics' Bank* v. *Dearing,* 91 U. S. 29; *Haseltine* v. *Central Bank,* 183 U. S. 132; *Schuyler National Bank* v. *Gadsden,* 191 U. S. 451.

To construe this Missouri statute as vesting in the state courts the right to determine whether any business transacted by a national bank constitutes a violation of law,

would bring it in direct conflict with § 5239, Rev. Stats., which vests this power in the Comptroller of the Currency to be exercised by suit in a United States court.

There is no analogy between *Davis* v. *Elmira Savings Bank,* 161 U. S. 275, and *McClellan* v. *Chipman,* 164 U. S. 347, and the present case. A different situation results where an act of Congress expressly authorizes a national bank to exercise a particular power when the exercise of such power is "not in contravention of state or local law." In such case the state court by *quo warranto* proceedings may assume jurisdiction for the purpose of determining whether the exercise of the power in question contravenes any laws of the State. *First National Bank* v. *Fellows,* 244 U. S. 416.

Were this a case of first impression, there might be fair ground for argument whether, under §§ 5134 and 5190, Rev. Stats., it was intended to restrict a national bank in " its usual business " to " one banking house in any one place," thereby meaning the geographical locality, whether city, town, or village, in which the national bank has been located. But this question does not now seem to be open. For over fifty years the executive department of the Government has consistently held, as a matter of administration, that the " usual business " of a banking association must be transacted in a single and well-defined banking building; and this administrative construction of the law has additional weight, not only because Congress has, by supplemental legislation, acquiesced in it by passing laws which, in exceptional instances, authorized branch banks, but also because the agitation for the right to have branch banks has been carried on for many years, and Congress has refused to authorize such branches. See 29 Ops. Atty. Gen. 81.

A branch bank, as the term is used in the National Bank Act, by the Attorney General and by the office of the Comptroller of the Currency, partakes of the nature

of a primary organization,—in practical operations, a complete substitute for a local bank in the locality which it serves. It is to many intents and purposes an additional bank under the same board of directors, closely associated with the parent bank, but operating in most matters independently.

Considering § 5190, Rev. Stats., in the light of this definition, the " banking house " is the legal domicile of the bank from which its discretionary powers are exercised and in which its policies are formulated and approved. If a national bank should attempt to establish and operate such a branch bank, such action could be treated by the Comptroller as a violation of § 5190. His remedy would be to bring suit in his own name for forfeiture of the charter. But the question remains, can a national bank transact no business whatever beyond the four walls of its office building? May it not have " service stations " for minor and routine purposes? If the answer is " No," how can it clear its checks in the clearing house? The words " the usual business ", as used in this section, can not be given a strictly literal interpretation. Much of the routine business of every bank must be transacted away from the banking house. This has always been the case. The business of banking is continually in process of growth and adjustment.

This portion of. § 5190, must, therefore, be construed in connection with that portion of § 5136, which provides that the board of directors may exercise all such incidental powers as shall be necessary to carry on the business of banking.

In the light of modern banking practice a narrow and literal construction of § 5190 is unworkable. The construction must be made with the practical situation in mind. *Merchants' Bank* v. *State Bank*, 10 Wall. 604.

The operations of a national banking association may be divided into two general classes: (a) Those which must

be performed by the board of directors; and (b) those which must be delegated to and performed by the officers, agents, or servants of the bank.

These powers may be again divided into those which require discretion, judgment, and banking experience, and those which are ministerial, clerical, and of routine character.

The powers performed by the board of directors may be described as discretionary powers, while those performed by officers, agents, or servants may be referred t' as ministerial powers.

The responsibility for the management and control of the affairs of the bank is definitely vested in the board of directors, and the services performed by officers or agents must be performed under the direction of and by delegation of authority from the board of directors. This being true, the discretionary powers of the board can not be delegated and must, therefore, be exercised only at the banking house.

On the other hand, the actual receipts of deposits, payment or certification of checks, the actual payment of money on loans authorized by the board, and other purely ministerial acts, of necessity must be performed by officers or agents. These acts, while usually performed at the banking house, are sometimes necessarily performed by correspondents or agents elsewhere.

It reasonably follows that, if a national bank has the incidental power to perform these administrative functions through its agents or servants, acting when necessary outside of its banking house, the bank may also, if necessary, maintain an office or offices—as distinguished from a branch—at a place other than its banking house.

To accommodate distant customers the need is strongly felt in many localities for the banks to maintain an office or offices at some distance from their banking houses fo. the purpose of receiving deposits and cashing checks.

A new development in banking practice has thus been instituted in a number of cities by the state banks. The national banks must be allowed to compete or suffer a serious loss in business and prestige. Did Congress contemplate a policy of unreasonable restriction, which might undermine the national banking system in the large centers of population?

[Counsel fully discussed the authority of the Comptroller, citing *Studebaker v. Perry,* 184 U. S. 258; *Cook County Natl. Bank* v. *United States,* 107 U. S. 445; Rev. Stats. § 5239; Agricultural Credits Act, 1923, c. 252, § 209a, 42 Stat. 1467.]

The Comptroller of the Currency has the right to determine, whether a national bank is maintaining a " branch bank," as distinguished from a " branch office," and, if satisfied that the outside business office is essentially a " branch bank," he is authorized to proceed in the courts of law to require such bank to abandon its branch under the penalty of a forfeiture of its charter.

This administrative power, however, does not necessarily imply a discretionary power to permit one bank to have a branch office and to deny it to another, or to permit one locality to have branch offices and to deny them to another. If a national bank may conduct its minor and routine operations, when necessary, beyond the walls of its place of business, it may be a right which the bank has as a part of its charter and not dependent upon any discretionary permission of the Comptroller. In this connection it is significant that the question of excesses of corporate power is to be determined in a judicial proceeding instituted by the Comptroller.

In any event the Comptroller, in his duty of compelling national banks to act within their corporate powers, has supervisory discretion; and this important duty emphasizes again the point, upon which the Government mainly relies, that a State may not, in a *quo warranto* proceeding, interfere with the exercise of such discretion.

*Mr. Jesse W. Barrett,* Attorney General of the State of Missouri, *Mr. Robert C. Morris* and *Mr. Frederick W. Lehmann,* with whom *Mr. Harold R. Small, Mr. Merton E. Lewis, Mr. Sam B. Jeffries, Mr. William T. Jones* and *Mr. Marion C. Early* were on the brief, for defendant in error.[1]

Branch banking by a national bank in the State of Missouri is conduct which either the national or state government has authority to stop, as such conduct is in excess of any authority from the Nation, is in contravention and defiance of the state law and is destructive of the law-abiding banks of the State.

National banks exist by virtue of federal legislation and are federal agencies subject, in the first instance, to the authority of the United States and the laws under which they are created. Their powers are measured by the express terms of the federal statutes relating to them and they can rightfully exercise only such powers or those incidental thereto which are necessary to carrying on the business for which they are created. *Logan County Bank v. Townsend,* 139 U.S. 67, 73. Under the provisions of Rev. Stats., § 5190, the usual business transactions of each national banking association are confined to one office or banking house. Exceptions to this general rule have been provided by statutes to meet the requirements of specific cases which do not include or comprehend the instant case. Rev. Stats., § 5155; Act May 12, 1892, c. 71, 27 Stat. 33, Act Mar. 3, 1901, c. 864, § 21, 31 Stat. 1444.

National banks are also subject to the laws of a State in respect to their affairs unless such laws conflict with federal laws or interfere with the purposes of their creation and tend to impair or destroy their efficiency as federal agencies. There is no conflict between the United States

---

[1] The case was argued, at the first hearing, on behalf of defendant in error, by *Mr. Merrill E. Otis* and *Mr. Harold R. Small. Messrs. Barrett, Jeffries, Jones* and *Early,* and *Mr. Edward W. Foristel* were also with them on the brief.

statutes and the laws of Missouri, and as the law is administered in Missouri, national and state banks are on an equal footing, neither having an advantage over the other.

The Missouri banking law provides that no bank shall maintain within the State a branch bank or receive deposits or pay checks except in its own banking house. R. S. Mo. 1919, § 11737. The Supreme Court of Missouri has construed this statute to mean that a bank's banking business shall be conducted in one banking house only. 297 Mo. 397.

A national bank has no authority under its charter to establish a branch or coördinate office for the purpose of carrying on a general banking business in the place designated in its certificate of organization. Neither do the federal statutes permit expressly or by implication a national bank to have domestic branches. This construction of the federal statutes relating to national banking associations has been uniformly supported by the executive officers and departments charged with the administration of the law. Rev. Stats., § 5155, amended, 1913, by § 8, Federal Reserve Act; Instructions of the Comptroller of the Treasury for 1923 under the heading of "Branch Banks;" 29 Ops. Atty. Gen. 81, 97; Op. Atty. Gen., Oct. 3, 1923.

The State, when its action is not in conflict with national law, can suppress unauthorized and unlawful conduct of a national bank within the State. The present case is not within the provisions of the Judicial Code or the Revised Statutes giving original or exclusive jurisdiction to the United States courts in certain actions and proceedings concerning national banking associations. *Herrmann* v. *Edwards,* 238 U. S. 107.

The State of Missouri in the proper exercise of its police powers has the right to suppress a wholly unauthorized, and unlawful, act in the State. *Guthrie* v. *Harkness,* 199 U. S. 148.

A proceeding in the nature of *quo warranto* is the appropriate remedy and means to question and stop unau-

thorized and unlawful conduct of a national bank in the State of Missouri. *Standard Oil Co.* v. *Missouri,* 224 U. S. 270; *First National Bank* v. *Fellows,* 244 U. S. 416.

It is plain from the history of the National Bank Act that there was no purpose at any time to confer upon national banks generally the power to establish and operate branches in the cities in which they were respectively located. Where by reason of peculiar circumstances such branch banks were thought proper, express provision was made for them, as was also done in the case of foreign branches. These exceptional instances, expressly provided for, make stronger the implication against branch banks generally. If branch banks are to become a regular feature of our banking system, it should be only as a consequence of an express grant of such power and until such grant is made national banks should not be permitted to put into practical effect a system of banking prohibited by the laws of the State and the Nation.

*Messrs. Herman L. Ekern, Clifford L. Hilton, Ulysses S. Lesh, Benjamin J. Gibson, Edward J. Brundage, H. H. Cluff, Milton J. Helmick, George F. Shafer, J. S. Utley, O. S. Stillman, Charles B. Griffith, Frank E. Healy, David J. Howell, E. T. England, Thomas B. McGregor, George T. Short, Buell F. Jones* and *John H. Dunbar,* Attorneys General, respectively, of the States of Wisconsin, Minnesota, Indiana, Iowa, Illinois, Utah, New Mexico, North Dakota, Arkansas, Nebraska, Kansas, Connecticut, Wyoming, West Virginia, Kentucky, Oklahoma, South Dakota and Washington, by leave of Court, filed a brief as *amici curiae.*[1]

---

[1] By leave of Court, briefs were also filed, at the first hearing, by the Attorneys General of the States of Wisconsin, Minnesota, Indiana, Iowa, Illinois, North Dakota, Arkansas, Kansas, Connecticut, South Dakota and Washington, and by *Mr. William Rothmann;* by *Mr. John A. Garver,* on behalf of the National City Bank of New York and The Chemical National Bank of New York; and by *Mr. John Quinn, Mr. Paul Kieffer* and *Mr. Robert P. Stewart,* on behalf of The National Bank of Commerce in New York, as *amici curiae.*

Mr. Justice Sutherland delivered the opinion of the Court.

The State of Missouri brought this proceeding in the nature of *quo warranto* in the State Supreme Court against the plaintiff in error to determine its authority to establish and conduct a branch bank in the City of St. Louis. The information avers that the bank was organized under the laws of the United States and was and is engaged in a general banking business in that city at a banking house, the location of which is given; that, in contravention of its charter and of the act of Congress under which it was incorporated, it has illegally opened and is operating a branch bank for doing a general banking business in a separate building several blocks from its banking house, and proposes to open additional branch banks at various other locations, and that this is in violation of a statute of the State expressly prohibiting the establishment of branch banks. The prayer is that, upon final hearing, the bank be ousted from the privilege of operating this branch bank or any other. A demurrer to the information was interposed and the cause thereupon submitted. The contention of the State was upheld and judgment rendered in accordance with the prayer. 297 Mo. 397.

The correctness of the judgment is challenged under numerous specifications of error presenting federal questions, which, for the purposes of the case, may be considered under two heads: (1) Whether the state statute is valid as applied to national banks; and (2) Whether a proceeding to call a national bank to account for acts of the kind here alleged may be maintained by the State, and whether the form of remedy pursued is sustainable.

First. The Missouri statute (§ 11737, R. S. Mo., 1919) provides "that no bank shall maintain in this state a branch bank or receive deposits or pay checks except in its own banking house." That the facts alleged in the in-

formation bring the case within that part of the statute which prohibits the maintenance of branch banks and that the statute applies to national banks is conclusively established by the decision of the state court, and we confine ourselves to the inquiry whether, as thus applied, the statute is valid.

National banks are brought into existence under federal legislation, are instrumentalities of the Federal Government and are necessarily subject to the paramount authority of the United States. Nevertheless, national banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States. *National Bank* v. *Commonwealth,* 9 Wall. 353, 362; *Davis* v. *Elmira Savings Bank,* 161 U. S. 275, 283. These two cases are cited and followed in the later case of *McClellan* v. *Chipman,* 164 U. S. 347, 357, and the principle which they establish is said to contain a rule and an exception, "the rule being the operation of general state laws upon the dealings and contracts of national banks, the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which national banks were created, or impair their efficiency to discharge the duties imposed upon them by the law of the United States." See also *Waite* v. *Dowley,* 94 U. S. 527, 533. The question is whether the Missouri statute falls within the rule or within the exception.

Does it conflict with the laws of the United States? In our opinion, it does not. The extent of the powers of national banks is to be measured by the terms of the federal statutes relating to such associations, and they can rightfully exercise only such as are expressly granted or such incidental powers as are necessary to carry on the business for which they are established. *Bullard* v. *Bank,* 18

Wall. 589, 593; *Logan County National Bank* v. *Townsend,* 139 U. S. 67, 73; *California Bank* v. *Kennedy,* 167 U. S. 362, 366.   Among other things the federal law (Rev. Stat., § 5134) provides that the organization certificate of the association shall specifically state "the place where its operations of discount and deposit are to be carried on, designating the State, Territory, or district, and the particular county, city, town, or village."   By another provision (Rev. Stats. § 5190) it is required that ": the usual business of each national banking association shall be transacted at an office or banking-house located in the place specified in its organization certificate."   Strictly, the latter provision, employing, as it does, the article " an," to qualify words in the singular number, would confine the association to one office or banking house.   We are asked, however, to construe it otherwise in view of the rule that " words importing the singular number may extend and be applied to several persons or things."   Rev. Stats., § 1. But obviously this rule is not one to be applied except where it is necessary to carry out the evident intent of the statute.   See *Garrigus* v. *Board of Commissioners,* 39 Ind. 66, 70; *Moynahan* v. *City of New York,* 205 N. Y. 181, 186.   Here there is not only nothing in the context or in the subject matter to require the construction contended for, but other provisions of the national banking laws are persuasively to the contrary.   By § 5138, Rev. Stats., the minimum amount of capital is fixed in proportion to the population of the place where the bank is located. If it had been intended to allow the establishment by an association of not one bank only but, in addition, as many branch banks as it saw fit, it is remarkable, to say the least, that there should have been no provision for adjusting the capital to the latter contingency or for determining how or under what circumstances such branch banks might be established or for regulating them.   Section 5155, Rev. Stats., provides that it shall be lawful for a stat

bank " having branches, the capital being joint and assigned to and used by the mother-bank and branches in definite proportions, to become a national banking association . . . and to retain and keep in operation its branches . . . the amount of the circulation . . . to be regulated by the amount of capital assigned to and used by each." This provision, confined by its terms, as it is, to existing state institutions, may be fairly considered as constituting an exception to the general rule, and the presence of safeguarding limitations in the excepted case, with their entire absence from the statute otherwise, goes far in the direction of confirming the conclusion that the general rule does not contemplate the establishment of branch banks. This apparently was the interpretation of Congress itself, since in two instances at least special legislation was deemed necessary to allow the establishment of branch banks, viz: at the Chicago Exposition, in 1892, c. 71, 27 Stat. 33, and at the St. Louis Exposition, in 1901, c. 864, 31 Stat. 1444, § 21, the existence of the branch bank in each instance being expressly limited to the period of two years.

The construction of the executive officers charged with the administration of the law has been, with substantial uniformity, to the same effect, and in this view the Department of Justice, in a well considered opinion, rendered May 11, 1911, concurred. Lowry National Bank—Establishment of Branches. 29 Ops. Atty. Gen. 81.[1]

This interpretation of the statute by the legislative department and by the executive officers of the government would go far to remove doubt as to its meaning if any existed. See *Tiger* v. *Western Investment Co.*, 221 U. S.

---

[1] Our attention is directed to a later opinion of the Attorney General, dated October 3, 1923, which, although in terms affirming the earlier opinion, announces a limited rule which does not seem to be in precise agreement with it. To the extent of the disagreement, however, we accept the view of the earlier opinion.

286, 309; *United States* v. *Hermanos y Compañia,* 209 U. S. 337, 339.

But is is said that the establishment of a branch bank is the exercise of an incidental power conferred by § 5136, Rev. Stats., by which national banking associations are vested with " all such incidental powers as shall be necessary to carry on the business of banking." The mere multiplication of places where the powers of a bank may be exercised is not, in our opinion, a necessary incident of a banking business, within the meaning of this provision. Moreover, the reasons adduced against the existence of the power substantively are conclusive against its existence incidentally; for it is wholly illogical to say that a power which by fair construction of the statutes is found to be denied, nevertheless exists as an incidental power. Certainly an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted.

Clearly, the state statute, by prohibiting branches, does not frustrate the purpose for which the bank was created or interfere with the discharge of its duties to the government or impair its efficiency as a federal agency. This conclusion would seem to be self evident, but if warrant for it be needed, it sufficiently lies in the fact that national banking associations have gone on for more than half a century without branches and upon the theory of an absence of authority to establish them. If the non-existence of such branches or the absence of power to create them has operated or is calculated to operate to the detriment of the government, or in such manner as to interfere with the efficiency of such associations as federal agencies, or to frustrate their purposes, it is inconceivable that the fact would not long since have been discovered and steps taken by Congress to remedy the omission.

Second. The state statute as applied to national banks is, therefore, valid, and the corollary that it is obligatory

and enforceable necessarily results, unless some controlling reason forbids; and, since the sanction behind it is that of the State and not that of the National Government, the power of enforcement must rest with the former and not with the latter. To demonstrate the binding quality of a statute but deny the power of enforcement involves a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law. It is insisted with great earnestness that the United States alone may inquire by *quo warranto* whether a national bank is acting in excess of its charter powers, and that the State is wholly without authority to do so. This contention will be conceded since it is plainly correct, but the attempt to apply it here proceeds upon a complete misconception of what the State is seeking to do, a misconception which arises from confounding the relief sought with the circumstances relied upon to justify it. The State is neither seeking to enforce a law of the United States nor endeavoring to call the bank to account for an act in excess of its charter powers. What the State is seeking to do is to vindicate and enforce its own law, and the ultimate inquiry which it propounds is whether the bank is violating that law, not whether it is complying with the charter or law of its creation. The latter inquiry is preliminary and collateral, made only for the purpose of determining whether the state law is free to act in the premises or whether its operation is precluded in the particular case by paramount law. Having determined that the power sought to be exercised by the bank finds no justification in any law or authority of the United States, the way is open for the enforcement of the state statute. In other words, the national statutes are interrogated for the sole purpose of ascertaining whether anything they contain constitutes an impediment to the enforcement of the state statute, and the answer being in the negative, they may be laid aside as of no further concern.

The application of the state statute to the present case
and the power of the State to enforce it being established,
the nature of the remedy to be employed is a question for
state determination; and the judgment of the state court
that the one here employed was appropriate is conclusive
unless it involves a denial of due process of law, which
plainly it does not.   We are not concerned with the ques-
tion whether an information in the nature of *quo war-
ranto,* according to the general principles of the law,
is in fact appropriate.   It is enough that the Supreme
Court of the State has so held:   *Standard Oil Co.* v. *Mis-
souri,* 224 U. S. 270, 287; *Twining* v. *New Jersey,* 211 U. S.
78, 110–111.   In *Iowa Central Ry. Co.* v. *Iowa,* 160 U. S.
389, 393, this Court said:   "But it is clear that the Four-
teenth Amendment in no way undertakes to control the
power of a State to determine by what process legal rights
may be asserted or legal obligations be enforced, provided
the method of procedure adopted for these purposes gives
reasonable notice and affords fair opportunity to be heard
before the issues are decided.   This being the case, it was
obviously not a right, privilege, or immunity of a citizen
of the United States to have a controversy in the state
court prosecuted or determined by one form of action in-
stead of by another. . . . Whether the court of last re-
sort of the State of Iowa properly construed its own con-
stitution and laws in determining that the summary pro-
cess under those laws was applicable to the matter which
it adjudged, was purely the decision of a question of state
law, binding upon this court."   See also *Louisville &
Nashville R. R. Co.* v. *Schmidt,* 177 U. S. 230, 236; *Hooker*
v. *Los Angeles,* 188 U. S. 314, 318; *Rogers* v. *Peck,* 199 U.
S. 425, 435.

The judgment of the Supreme Court of Missouri is
therefore    ·

*Affirmed.*

MR. JUSTICE VAN DEVANTER, dissenting.

I am constrained to dissent from the opinion and judgment just announced.

National banks are corporate instrumentalities of the United States created under its laws for public purposes essentially national in character and scope. Their powers are derived from the United States, are to be exercised under its supervision and can be neither enlarged nor restricted by state laws. The decisions uniformly have been to this effect and have proceeded on principles which were settled a century ago in the days of the Bank of the United States.

In *McCulloch* v. *Maryland*, 4 Wheat. 316, where the status of that bank was drawn in question and elaborately discussed, this Court reached the conclusion that the Constitution invests the United States with authority to provide, independently of state laws, for the creation of banking institutions, and their maintenance at suitable points within the States, as a means of carrying into execution its fiscal and other powers. Chief Justice Marshall there dealt with the respective relations of the United States and the States to such an instrumentality in a very plain and convincing way. Among the other things, he said:

(p. 424) " After the most deliberate consideration, it is the unanimous and decided opinion of this court, that the act to incorporate the Bank of the United States is a law made in pursuance of the constitution, and is a part of the supreme law of the land."

(p. 427) " It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its operations from their influence. This effect need not be stated in terms. It is so involved in the declaration of supremacy, so necessarily implied in it, that the expression of it could not make it more certain."

(p. 429) " The sovereignty of a State extends to every-. thing which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States? We think it demonstrable that it does not. Those powers are not given by the people of a single State. They are given by the people of the United States, to a government whose laws, made in pursuance of the constitution, are declared to be supreme."

In *Osborn* v. *Bank of the United States,* 9 Wheat. 738, there was drawn in question the validity of a state statute which, after reciting that the bank had been pursuing its operations contrary to a law of the State, provided that if the operations were continued the bank should be liable to specified exactions, called a tax. The statute was held invalid, the Court saying:

(pp. 860, 861) " The Bank is not considered as a private corporation, whose principal object is individual trade and individual profit; but as a public corporation, created for public and national purposes. That the mere business of banking is, in its own nature, a private business, and may be carried on by individuals or companies having no political connexion with the government, is admitted; but the Bank is not such an individual or company. It was not created for its own sake, or for private purposes . . . It is an instrument which is ' necessary and proper ' for carrying on the fiscal operations of government."

The later legislation of Congress under which national banks are created and maintained stands on the same constitutional plane. When its validity has been assailed, or its operative force in a State questioned, the cases just mentioned have been regarded as settling the principles to be applied.

In *Farmers' and Mechanics' National Bank* v. *Dearing,* 91 U. S. 29, 31, the Court referred to those cases, pro-

nounced their reasoning applicable to the later legislation, and said:

(pp. 33-34) " The national banks organized under the act are instruments designed to be used to aid the government in the administration of an important branch of the public service.   They are means appropriate to that end. . . . Being such means, brought into existence for this purpose, and intended to be so employed, the States can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit.   Any thing beyond this is ' an abuse, because it is the usurpation of power which a single State cannot give.' "

To the same effect are *Easton* v. *Iowa,* 188 U. S. 220, 230, 237; *Van Reed* v. *People's National Bank,* 198 U. S. 554, 557; *First National Bank* v. *Union Trust Co.,* 244 U. S. 416, 425; and *First National Bank* v. *California,* 262 U. S. 366, 369.   Of special pertinence are the following excerpts from *Easton* v. *Iowa:*

(p. 229) " That legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States."

(pp. 231-232) " It thus appears that Congress has provided a symmetrical and complete scheme for the banks to be organized under the provisions of the statute.

" It is argued by the learned Attorney General on behalf of the State of Iowa that ' the effect of the statute of Iowa is to require of the officers of all banks within the State a higher degree of diligence in the discharge of their duties. It gives to the general public greater confidence in the stability and solvency of national banks, and in the honesty and integrity of their managing officers.   It enables them better to accomplish the purposes and designs.

of the general government, and is an aid, rather than impediment, to their utility and efficiency as agents and instrumentalities of the United States.'

" But we are unable to perceive that Congress intended to leave the field open for the States to attempt to promote the welfare and stability of national banks by direct legislation. If they had such power it would have to be exercised and limited by their own discretion, and confusion would necessarily result from control possessed and exercised by two independent authorities."

It must be admitted that, in so far as the legislation of Congress does not provide otherwise, the general laws of a State have the same application to the ordinary transactions of a national bank,—such as incurring and discharging obligations to depositors, presenting drafts for acceptance or payment and giving notice of their dishonor, taking pledges for the repayment of money loaned, and receiving or making conveyances of real property,—that they have to like transactions of others. But not so of questions of corporate power. As explained in *Easton* v. *Iowa* and other cases, their solution must turn on the laws of the United States under which the bank is created.

National banks, like other corporations, have such powers as their creator confers on them, expressly or by fair implication, and none other. *Thomas* v. *West Jersey R. R. Co.,* 101 U. S. 71, 82; *Logan County National Bank* v. *Townsend,* 139 U. S. 67, 73. Powers not so conferred are in effect denied; a prohibition is implied from the failure to grant them. *First National Bank* v. *National Exchange Bank,* 92 U. S. 122, 128; *California Bank* v. *Kennedy,* 167 U. S. 362, 367. In short, all the powers of a national bank, like its right to exist at all, have their source in the laws of the United States. Only where those laws bring state laws into the problem,—as by enabling national banks to act as executors, administrators, etc., where that is permitted by state laws,—can the latter have

any bearing on the question of corporate power—the privileges which the bank may exercise. *First National Bank* v. *Union Trust Co.*, 244 U. S. 416.

The proceeding now before us is an information in the nature of *quo warranto* brought in the Supreme Court of Missouri, whereby that State challenges the power of a national bank in the City of St. Louis to conduct a branch bank established by it in that city and asks that the bank be ousted from that privilege on the grounds, first, that establishing and conducting the branch is a violation of the bank's charter powers, and, secondly, that it is prohibited by a law of the State.

It is not claimed that the laws of the United States contain any provision whereby the privilege asserted by the bank is made to depend on the will or legislative policy of the State; nor do they in fact contain any such provision. Whether the bank has the privilege which it asserts is therefore in no way dependent on or affected by the state law, but turns exclusively on the laws of the United States. If they grant the privilege, expressly or by fair implication, no law of the State can abridge it or take it away. And if they do not grant it, they in effect prohibit it, and no law of the State can strengthen or weaken the prohibition. In either event nothing can turn on the state law. It simply has no bearing on the solution of the question.

In this situation the State is not, in my opinion, entitled to maintain the proceeding. It has no distinctive right to protect, nor any applicable law to vindicate or enforce. The proceeding is one which may be maintained only in the public right. Here the State is not authorized to represent or to speak for the public. The bank is not a creation and instrumentality of the State, but of the National Government. Its presence in the State is attributable to the national power, not to the State's permission. Whether the bank shall be kept within its legitimate powers and made to discontinue any departure from or abuse

of them is a matter in which the people of all the States have the same interest, the bank being a national creation and instrumentality. The people of Missouri merely share in the common interest. " In that field it is the United States, and not the State, which represents them as *parens patriae,* when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status." *Massachusetts* v. *Mellon,* 262 U. S. 447, 486. It therefore is apparent that the State is here mistakenly appropriating to itself a function which belongs to the United States.

In *Tarble's Case,* 13 Wall. 397, 407, which possessed features making it particularly pertinent here, this Court pointed out the distinct and independent character of the national and state governments, within their respective spheres, and in that connection said:

" Neither can intrude with its judicial process into the domain of the other, except so far as such intrusion may be necessary on the part of the National government to preserve its rightful supremacy in cases of conflict of authority. In their laws, and mode of enforcement, neither is responsible to the other. How their respective laws shall be enacted; how they shall be carried into execution; and in what tribunals, or by what officers; and how much discretion, or whether any at all shall be vested in their officers, are matters subject to their own control, and in the regulation of which neither can interfere with the other."

Another case apposite in principle is *Territory* v. *Lockwood,* 3 Wall. 236. It was a proceeding in the nature of *quo warranto* brought by the Territory of Nebraska to test the defendant's right to hold a federal office in the Territory which he was charged with unlawfully usurping. This Court disposed of the matter by saying, p. 239:

" The right of the Territory to prosecute such an information as this would carry with it the power of amotion

without the consent of the government from which the appointment was derived. This the Territory can ..o more accomplish in one way than in another. The subject is as much beyond the sphere of its authority as it is beyond the authority of the States as to the Federal officers whose duties are to be discharged within their respective limits. The right to institute such proceedings is inherently in the Government of the nation."

With great deference, I think the judgment below should be reversed on the ground that the State is without capacity to bring or maintain this proceeding, and the court below without authority to entertain it.

THE CHIEF JUSTICE and MR. JUSTICE BUTLER authorize me to say that they concur in this dissent.