FIRST NATIONAL BANK OF
MILACA, Appellant,

v.

John G. HEIMANN, Comptroller of the
Currency of the United
States, Appellee.

No. 77–1628.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 11, 1978.

Decided March 10, 1978.

Kevin J. Hughes, Hughes, Hughes, Thoreen & Sullivan, St. Cloud, Minn. (argued), and Fred J. Hughes, St. Cloud, Minn., on brief, for appellant.

Donald Etra, Atty., App. Sec., Civ. Div., Dept. of Justice, Washington, D. C. (argued), Ronald R. Glancz, Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., and Andrew W. Danielson, U. S. Atty., Minneapolis, Minn., on brief, for appellee.

Before BRIGHT, STEPHENSON and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

This is a suit for injunctive relief and for damages brought by the First National Bank of Milaca, hereinafter called the Bank or plaintiff, against the Comptroller of the Currency of the United States,[1] in the United States District Court for the District of Minnesota. The Bank, a relatively small institution, is located in Milaca, Minnesota. It complains of a regulation promulgated by the Comptroller in January, 1976 which substantially changes the method whereby charges made to national banks for periodic examinations are computed; the challenged regulation appears at 12 C.F.R. § 8.2 (1976), and it operates to increase substantially the charges the "smaller" banks are required to pay for semi-annual examinations by examiners employed by the Comptroller. The position of plaintiff is that the new regulation violates the provision of 12 U.S.C. § 482 requiring that charges made by the Comptroller for examinations of national banks under the provisions of 12 U.S.C. § 481 are

to be "in proportion to assets or resources held by the banks upon the dates of examination of the various banks."

The parties stipulated that the case was an appropriate one for disposition by summary judgment, and they also stipulated as to the methods whereby charges to national banks for examinations have been made down through the years since the formation of our national banking system in 1863 and 1864. Cross motions for summary judgment were duly filed and the cause was submitted to the district court (The Honorable Edward J. Devitt, Chief Judge) on the pleadings, the stipulation of the parties, an affidavit of Robert Bloom, Acting Comptroller of the Currency, and memorandum briefs. On May 31, 1977 Judge Devitt filed a full but unpublished memorandum opinion and granted summary judgment in favor of the Comptroller. Plaintiff filed a timely notice of appeal. We affirm the judgment of the district court.

The complaint alleges, and it is admitted, that in March, 1976 plaintiff was required to pay a charge of $2846.00 based on assets of $17,594,000.00, and that the charge was $1900.00 in excess of what the Bank would have been required to pay under the schedule of charges in effect before the 1976 change made by the Comptroller. Plaintiff seeks to recover the $1900.00 just mentioned and also seeks to enjoin the Comptroller from further collections under the current schedule.

At the outset the district court was confronted with a jurisdictional question which it resolved in favor of the plaintiff. While the question has not been urged here, we have considered it and have concluded that the district court had jurisdiction under the provisions of 28 U.S.C. §§ 1331(a) and 1346(a)(2).

The challenged regulation was promulgated by the Comptroller pursuant to the authority conferred on him by 12 U.S.C.

---

1. When the suit was filed on July 1, 1976 James E. Smith was Comptroller of the Currency. He resigned on July 31, 1976 and was succeeded by Robert Bloom as Acting Comptroller. The present Comptroller who appears here as appellee is John G. Heimann.

§ 481. The reason for the change in the method of computing charges was that the Comptroller had determined on the basis of computer studies that the smaller national banks in the country were paying much less for examinations than the costs incurred by the Comptroller's office in examining them whereas the charges that the larger banks were required to pay were disproportionally large in relation to cost.

Under the new schedule the smaller banks will pay substantially more for examinations than they have paid in the past. The larger and largest banks will continue to pay much larger sums of money for examinations than the smaller banks but they will benefit to some extent from a sliding scale of percentages that the new schedule includes.

We will elaborate on these statements as the opinion proceeds.

### I.

Our national banking system has been characterized historically by the requirement that national banks be examined periodically by examiners appointed by the Comptroller of the Currency, and that the costs of the examinations be borne by the banks being examined; the costs that the banks are required to bear are both direct and indirect. Under the provisions of 12 U.S.C. § 481 every national bank in the country must be examined at least three times every two years.

Down through the years various methods of computing the charges made to banks have been used. From 1863 to 1875 a bank was charged $5.00 per day for each day consumed in its examination, plus a mileage charge of $2.00 for every 25 miles travelled by the examiner in reaching the office of the bank to be examined. The method was changed by legislation in 1875, and it was provided that charges would be based on the amount of capital of the respective banks; the charges ranged from a low of $20.00 per examination for the smallest banks to $75.00 per examination for the largest banks. It is interesting to observe that the largest banks fell into the category described as banks having a capital of $600,000.00 or more.

When the Federal Reserve Act of 1913 was adopted, the Comptroller was authorized to prescribe regulations governing the computation and the assessment of the expenses of examinations and the collection of such assessments from the banks or affiliates being examined. That authority appears in 12 U.S.C. § 481.

The authority conferred on the Comptroller by what is now § 481 was limited in two respects by what is now 12 U.S.C. § 482. First, the assessments must be "in proportion to" the assets of the banks being examined as of the dates of the examinations. Second, the assessment rate must be the same for all national banks, except that banks that are examined more than twice in a single calendar year are required to pay for the additional examinations.

Between 1914 and the effective date of the challenged regulation charges made to national banks for examinations were based on a fixed fee plus a percentage of the assets of the respective banks. Generally speaking, both the fixed fee and the percentage increased with the passage of time.

Before 1961 the fixed fee was imposed with respect to the first $20,000.00 of a bank's assets, and the percentage figure was applied to assets in excess of $20,000.00. After 1961 the percentage figure was applied to all assets so that the first $20,000.00 of assets was subject to both the fixed fee and the percentage.

Between 1969 and 1976 national banks were charged for each semi-annual examination a fixed fee of $200.00 plus $.045 per

$1,000.00 of assets, which works out to $45.00 per million dollars of assets.

The present schedule of charges which is involved here and which we set out in the margin [2] retains the concept of a fixed fee plus a percentage of assets, but with two important differences. First, the fixed fee varies directly with the amount of assets of the bank being examined. Second, the percentage is on a sliding scale which varies inversely to the value of the assets of the bank in question.

A glance at the present schedule shows that banks have been placed in ten categories as far as assets size is concerned. The lowest category consists of very small banks with assets of less than one million dollars. A bank in that category pays no fixed fee for an examination. At the other end of the scale are the very large banks with assets in excess of twenty billion dollars. A bank in that category must pay a fixed fee of $689,425.00 per examination.

As far as the percentage charges are concerned, however, a bank in the lowest category pays .001000 of the value of its assets per examination, whereas the percentage applied to a bank in the highest category is .000021 on the excess of its assets over twenty billion dollars.

Plaintiff bank falls within the category of banks having assets valued at between $10,000,000.00 and $50,000,000.00, and with respect to the examination involved in this case the Bank was required to pay $2846.00, whereas under the former schedule it would have been required to pay only $946.00.

The position of plaintiff is that the downward sliding scale of percentage charges prescribed by the present regulation violates the requirement of § 482 that the charges made to banks must be "in proportion to" the value of their assets. Plaintiff contends that under § 482 the only acceptable method of computing charges is to apply a fixed percentage figure to the total value of the assets of a bank as of the date of the bank's examination.[3]

## II.

The record in the case includes a detailed affidavit of Acting Comptroller Bloom in which he discusses the nature and history of national bank examinations, and the experience that successive Comptrollers have had with examination costs as compared to the yields of the assessments that have been made to defray the costs of the examinations. Mr. Bloom also undertakes to explain how the present regulation came to be adopted. His affidavit is uncontroverted, and while we do not necessarily accept everything that is said in it, we think that in general reliance can be placed on Mr. Bloom's statements.

| 2. | Over | | But Not Over | | This Amount | Plus | | Of Excess Over |
|---|---|---|---|---|---|---|---|---|
| $ | 0 million | $ | 1 million | $ | 0 | .001000 | $ | 0 |
| | 1 million | | 10 million | | 1,000 | .000125 | | 1 million |
| | 10 million | | 50 million | | 2,125 | .000095 | | 10 million |
| | 50 million | | 100 million | | 5,925 | .000060 | | 50 million |
| | 100 million | | 500 million | | 8,925 | .000050 | | 100 million |
| | 500 million | | 1,000 million | | 28,925 | .000045 | | 500 million |
| | 1,000 million | | 3,000 million | | 51,425 | .000040 | | 1,000 million |
| | 3,000 million | | 10,000 million | | 131,425 | .000034 | | 3,000 million |
| | 10,000 million | | 20,000 million | | 369,425 | .000032 | | 10,000 million |
| | 20,000 million | | . . . . . . . . . . . | | 689,425 | .000021 | | 20,000 million |

3. Plaintiff concedes that the fixed fee plus a percentage charge that was in force between 1914 and 1976 involved a slight departure from the method that plaintiff says is required by the statute. Plaintiff says, however, that the departure was de minimis and that in present context no significance is to be attached to it.

The record in the case, including the Bloom affidavit, reflects that between 1970 and 1976 the cost to the Comptroller of examining national banks increased markedly for a number of reasons including higher salaries required to be paid to bank examiners and other employees concerned with examinations and reports thereof and the general effect of inflation, and during that period revenues derived from assessments made against banks in connection with examinations were not keeping pace with the increasing costs.

Faced with the problem of raising more money, the Comptroller had to keep in mind the requirement of § 482 that charges must be in proportion to assets and the desirability of having the charge made to a particular bank approximate the cost of the examination.

For a number of reasons, all of which need not be listed here, it is cheaper in proportion to examine the affairs of a large bank than it is the affairs of a small one. For one thing, an examination involves certain fixed charges which are not greatly affected in amount by the size of the bank being examined. Further, the affairs and records of a large and well run bank are apt to be easier to examine than those of a small bank; and there are also what Mr. Bloom refers to as economies of scale.

Although Comptrollers of the Currency have known for a long time that under existing schedules of charges small banks were paying less than what it cost to examine them and that large banks were paying more than what their examinations cost the Comptroller's office, it was not until recently that the Comptroller was able to determine with accuracy the extent of the disparity just mentioned.

At some unspecified time but obviously not too long before the Comptroller proposed the current schedule of charges, he had been able by making wide use of computers to determine what Mr. Bloom refers to as "relative cost coverage" with respect to national bank examinations. The relative cost coverage is the ratio between income derived from an assessment made against a national bank in connection with an examination and the actual cost of the examination.

The study showed that under the schedule of charges that existed in the early 1970's the small banks having assets of $5,000,000.00 or less were paying only 27.1% of the cost of examining them, whereas the largest banks with assets of more than twenty-five billion dollars were paying 286.3% of the cost of their examinations. And a bank in plaintiff's category was paying 37.5% of the cost of examinations.

Under the present schedule the smallest banks are paying or will be required to pay 69.8% of the cost of examinations, whereas the largest banks are paying or will be required to pay 193.6% of the cost in question, and a bank in plaintiff's category is paying or will be required to pay 74.6% of the cost.

Assuming the validity of the relative cost coverage concept, the ideal coverage for all banks in all categories would be 100%, that is to say every bank, regardless of size, would pay for each examination exactly what the examination cost to conduct. Obviously, the current schedule does not achieve that goal although it comes quite close to it in the case of banks falling within certain categories of asset size. In that connection Mr. Bloom stated in his affidavit that a conscious decision was made not to require 100% relative cost coverage for all banks in one step as this would have raised the assessments on small banks too quickly to be "comfortably accommodated" by them, and that a gradual approach was adopted.

### III.

While we have found it desirable to state the case in considerable detail, actually the question presented by the record is a quite

narrow one, as the district court recognized when it was considering the controversy.

■ There is no question that under the provisions of § 481 the Comptroller has the authority to promulgate regulations dealing with the computation and collection of assessments made upon banks for the expenses of examinations. And there is nothing in this record to suggest that the challenged regulation is irrational, or that it was adopted arbitrarily or capriciously. The sole question is whether the regulation conflicts with the statutory requirement of § 482 that charges and assessments growing out of examinations of national banks must be "in proportion to" the assets of the respective banks on the dates of their examination. If the regulation does conflict with the statute, it cannot stand. *Cf. United States ex rel. Chase v. Wald*, 557 F.2d 157, 161 (8th Cir. 1977), and cases cited. Otherwise, it must be upheld.

The statute requires that charges made for examinations bear a proportional relationship to the value of the assets of the banks being examined, but the statute does not say exactly what that proportional relationship is. The term "in proportion to" is not precise; it may mean any one of several things.

■ We think that when Congress geared examination charges to asset size, it intended to do no more than impose on the Comptroller an objective standard for assessments which would protect small banks from having to pay more in terms of money than large banks were required to pay and which would protect individual banks of whatever size from discrimination in the matter of charges. The intention of Congress to prohibit discrimination is emphasized by its requirement in § 482 that assessment rates must be uniform throughout the country.

■ The regulation in question stems from the Comptroller's interpretation of §§ 481 and 482 considered together. And his interpretation is entitled to great weight. As was said in *Investment Co. Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971):

> But we cannot come lightly to the conclusion that the Comptroller has authorized activity that violates the banking laws. It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of the banking laws to an extent that warrants the invocation of this principle with respect to his deliberate conclusions as to the meaning of these laws. See *First National Bank v. Missouri*, 263 U.S. 640, 658, 44 S.Ct. 213, 68 L.Ed. 486.

The Comptroller does not contend in support of the current fee schedule that he has the power to ignore the asset size requirement of § 482 or to give asset size a place of secondary importance in determining how much to charge banks for examinations. What the Comptroller does contend is that he is not required to consider asset size to the exclusion of everything else, and that he is not required to prescribe charges that are in exact, direct and mathematical proportion to the values of assets of particular banks or categories of banks. His position is that the current schedule of rates satisfies § 482 because the schedule is related directly to asset size and because asset size is the determining factor in the equation. Hence, he argues that the rates prescribed by the current schedule are "in proportion" to asset values and are valid even though in operation they will require smaller banks to pay more for examinations than they have been required to pay in years prior to 1976 and will enable larger banks to pay less than they would be required to pay if a fixed percentage was applied across the board to the value of their assets.

1250

We accept the Comptroller's construction of the statutory term in controversy, and we also agree with him that the current schedule satisfies the requirement of § 482.

It is clear to us that when all is said and done the amount of the charge that a national bank must pay for an examination is determined in the last analysis by the value of its assets on the date of the examination and that both the fixed fees and the percentage rates set out in the schedule are "in proportion to" asset value. As to the fixed fees, the proportion is direct; as to the percentage rates the proportion is inverse. That fact, however, does not destroy the proportional relationship between amount of charge and asset size.

While we are of the view that § 482 was designed in part to protect small banks from excessive charges for examinations, we see nothing in either § 481 or § 482 to suggest that Congress intended for small banks to get by with paying a fraction of what it cost to examine them with the slack being taken up by excessive charges imposed on the larger banks. We think that in 1976 the Comptroller had a legal right to move against the situation just described, and that the means chosen by him was neither unlawful nor inappropriate.

Affirmed.