**STARR, Atty. Gen., v. O'CONNOR, Comptroller of the Currency, et al.**

**Nos. 8461, 8462.**

Circuit Court of Appeals, Sixth Circuit.

March 14, 1941.

---

550

Gaylord N. Bebout, of Lansing, Mich., and Merlin Wiley, of Detroit, Mich. (Thomas Read, Gaylord N. Bebout, and Edmund E. Shepherd, all of Lansing, Mich., and Irving B. Feldman, of Detroit, Mich., on the brief), for appellant and cross-appellee.

Robert S. Marx, of Cincinnati, Ohio (Robert S. Marx, of Cincinnati, Ohio, Carl Runge and Lawrence I. Levi, both of Detroit, Mich., and Frank E. Wood and Nichols, Wood, Marx & Ginter, all of Cincinnati, Ohio, on the brief), for appellee and cross-appellant.

Before SIMONS, ALLEN, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

Both parties have appealed from the judgment of the District Court in a declaratory judgment suit, involving the validity and applicability of the escheat laws of Michigan to dormant deposit accounts in an insolvent National Bank in liquidation by a receiver appointed by the Comptroller of the Currency of the United States. The short opinion of the District Judge will be found in Starr v. Schram, D.C., 24 F.Supp. 888.

The Attorney General of Michigan filed the suit on behalf of the state against the receiver of the First National Bank-Detroit and the Comptroller of the Currency of the United States, the latter of whom was dismissed on motion as an unnecessary party.

In the background was the failure of the First National Bank-Detroit, which suspended business on February 11, 1933. The case was tried in the District Court on stipulation of facts.

According to the stipulation when filed, there appeared on the books of the bank 123,897 separate deposit balances totalling $1,799,097.66 upon which no claims had been presented to and accepted by the Receiver. One thousand and nineteen of these accounts, in the aggregate sum of $483,742.18, have been claimed by the Receiver as offset by indebtedness to the bank. Included in the tabulations are numerous dormant accounts of partnerships, corporations and associations, and 9,425 items totalling $326,062.48 consisting of outstanding cashier's checks, certified checks, certificates of deposit, drafts on correspondent banks, Christmas Club checks, and garnisheed accounts. The average unclaimed and unproven account amounts to nine dollars.

For full comprehension of the questions of law for decision, it will be necessary to survey, at some length, the provisions of the several Michigan statutes of escheat. Before this undertaking, it seems appropriate, however, to comment that the Michigan State Constitution, in Article XI, Section 12, provides that, "All lands, the titles to which shall fail from a defect of heirs, shall escheat to the state"; and in Article VI, Section 20, the Secretary of State, the State Treasurer, and the Commissioner of the Land Office are constituted a State Board of Escheats.

The Michigan Statutes of Escheat.

Act No. 151, Public Acts of 1846, directs that the trustees appointed by a legislative act of 1842 shall take charge of and sell, or otherwise dispose of, "all lands or other property which may have escheated, or which may hereafter escheat to the state, by reason of the owner thereof dying intestate, and leaving no legal heirs thereto according to the statutes in such case made and provided."

The next legislation pertaining to escheat was Act No. 238, Public Acts of 1897, entitled, "An Act for the ascertainment and protection of the interests of the State in escheated estates." This lengthy law burdens the State Attorney General with official responsibility for the care of all matters pertaining to escheat, and for inquiry and investigation concerning all property, in every county of the state, belonging to persons dying intestate "leaving no legal heirs" and whose estate under the Michigan laws of descent would become vested in the state. The Attorney General is obligated to see that escheated estates are promptly and properly administered in accordance with the general statutes of Michigan; and to represent and protect the interest of the state in such administration proceedings.

Six sections of the statute are devoted to requirements for protection by the Attorney General of "uncalled for" bank deposits. All persons, co-partnerships, companies or corporations engaged in banking or trust business in the state are required to report annually to the Commissioner of Banking the name of each of their depositors who has had no dealings with respect to his account for a period of twenty years or more after the date of his last deposit, the amount and date of such deposit, and the amount of any interest due thereon. The Attorney General is authorized and directed to file bills in chancery to compel full, complete and truthful statements required by the Act against all those believed by him not to have made proper disclosure.

Upon obtaining knowledge that any depositor has had no dealings with a depository of his money or securities within seven years from the date of his last deposit, and that "there is good reason to believe that such person is dead and that his estate should escheat to the State of Michigan," it is the duty of the Attorney General to see that appropriate administration is obtained. The administrator, when appointed and qualified, shall have the right to demand and receive from any depository the "deposits of money, or securities of such missing person within its possession and control," for administration thereon as provided for escheated estates. Other property of such missing person is to be embraced in the administration.

The Act raises the presumption of death in the case of any person who disappears, if his whereabouts remain unknown for seven years. If no persons are found who would be his heirs if he were dead, his estate shall be administered as an escheated estate. Further provision is made that, after full administration by the Probate Court, the residue of all property shall be delivered to the State Board of Escheats, who shall, as soon as possible, cover the property into the State Treasury for the use of the primary school fund. Detailed procedure is specified for the sale of realty by the Board of Escheats, upon proper notice, and upon terms of credit if deemed "best calculated to produce the highest price," with requirement of security for unpaid purchase money.

Within ten years after an estate has been escheated, any person proving satisfactorily to the Board of Escheats that he or she is entitled to the estate, as husband, wife, heir at law, next of kin, devisee, legatee, or assignee of the deceased, shall, upon payment of the expenses incurred by the state in relation to the escheated estate, receive his or her just proportionate share of either the property in kind, or the proceeds thereof. Any supposedly deceased person, whose estate has been escheated, may *at any time,* upon presenting to the Board of Escheats satisfactory proof of his identity, receive the escheated property, or the avails thereof, less any expense incurred by the state. Upon proof satisfactory to the Board of State Auditors, any depository shall be indemnified by the state in the amount of any damage or loss sustained from performance of a contract of deposit disturbed by the requirements of the Act.

Act No. 205 of the Public Acts for 1925 (Comp.Laws of Michigan for 1929, Secs. 15624–15653, inclusive) established a code for the administration of estates of missing persons.

The Act provides: "Whenever any person leaving property in the state of Michigan shall have been absent from his or her last known place of abode for the continuous period of seven (7) years with his or her whereabouts also for such period unknown to those persons most likely to know thereof, and such person has for the like period not been heard from by those persons most likely to hear from such person, the property of such person in the state of Michigan may be administered as though such person were dead, subject to the conditions, restrictions and limitations hereinafter described." Section 15625.

Jurisdiction is vested in the Probate Court, and the proceedings there are prescribed. The petition for administration must contain specific allegations to develop the essential facts. Notice of hearing on the petition is directed to be published once each calendar month for four months prior to the month set for the hearing, and in addition timely notice must be sent by registered mail to each person named in the petition as heir at law, next of kin, devisee and legatee.

The last known place of abode of the absent person, his or her disappearance therefrom, knowledge of his or her whereabouts and whether he or she has been heard from are all made issues of fact to be determined by the Probate Court. Signed statements or oral declarations,

where depositions cannot be compelled by process of law, are to be received in evidence. Except for tax payments and other specified purposes, no sale, mortgage or other disposition of the property of the absent person is permitted until one year after the appointment and qualification of the personal representative, nor is any distribution permitted until such time. Indeed, no distribution can be made for three years without the execution and delivery by the distributees of an approved surety company bond in a penal sum not less than the value of the property to be distributed, conditioned upon the return of the property or its value in case the absent person should be adjudicated to have been still living since the commencement of the seven-year period, and also conditioned to save the personal representative harmless from all damages and expenses of suits or proceedings based on such distribution having been made prior to the expiration of three years from the appointment and qualification of the personal representative.

Conditioned on securing costs and expenses, any person, within three years after the appointment and qualification of the personal representative, may file a petition claiming himself, or herself, to be the absent person; in which event, the issue of identity of the claimant shall be determined by the court. If the claimant prevails, the administration proceedings are to be vacated, "except those providing for the payment of taxes, special assessments, liens, insurance premiums, allowed claims, the specific fulfillment of contracts, the prevention of great depreciation on account of neglect; and also except any sale, mortgage, or other disposition of the property of the absent person to innocent persons for value made to effect the results first above excepted."

Under the terms of the Act, any claimant establishing that the absent person died subsequently to the seven-year period can, by showing entitlement to the property in administration, cause the administration proceedings to be vacated upon required terms, protective of innocent parties.

Section 15 of the Act contains the important declaration that a *conclusive presumption* shall arise that the absent person died prior to the filing of the petition for administration or the probate of his or her will in case no person, within three years after the appointment and qualification of the personal representative, shall claim either to be the absent person, or to have succeeded to the rights of the absent person since the commencement of the seven-year period. Provision is made that after appropriate distribution, the estate shall be closed, the liability of distributees ended, and their bonds cancelled; and the liability of the representative to claimants also terminated.

The proviso is added that if the period of absence shall have exceeded fifteen years at the time of the filing of the petition for appointment of an administrator, the estate may be distributed and closed at the end of one year without a bond being given. Other provisions deal with shares of apparent beneficiaries who have been absent for seven years. The Probate Court must determine all fact issues pertaining to the rights of such claimants. Broad appeals to the Circuit Court are allowed persons adversely affected by the orders of the Probate Court; and the Supreme Court is authorized to promulgate appropriate rules to regulate the practice in matters covered by the Act.

Such were the laws of escheat existing in Michigan at the time of the suspension of the First National Bank-Detroit, on February 11, 1933. Shortly thereafter, the legislature enacted three new statutes affecting escheats.

The first of these, Act No. 40 of the Public Acts of Michigan for 1933, approved March 31, 1933, amended Act 238 of the Public Acts of Michigan for 1897 so as to require depositories, under penalty for failure to comply, to certify to the Attorney General all deposits "where the person, firm or corporation making such deposits has not had any dealings in relation thereto for a period of twelve years or more" since the last deposit.

The next in sequence, Act No. 45 of the Public Acts for 1933, approved April 6, 1933, also amended Act No. 238 for 1897 so as to permit the Attorney General or State Public Administrator to combine estates in the same administration proceeding for purposes of escheat, provided the aggregate value of the combined estates should not exceed five hundred dollars. No separate publication for individual estates is required, and only one surety bond is made necessary. With respect to the administration of the estates of persons missing seven years, this amendatory act, in a new section, (10a), provides that in case

there are no known heirs, proof for escheat purposes shall be sufficient when it shall appear from reliable sources or from the books and records of the person, co-partnership, company, or corporation, with whom the disappeared or missing person has deposited monies, securities, or other property, or when it shall appear from reliable sources or from such books and records that for a continuous period of seven years, such missing person has had no dealings with such depository in regard to his property or money deposited.

Act No. 171 of the Public Acts of Michigan for 1933, approved June 28, 1933, was the third amendatory act in the series. Still dealing with the amendment of Public Act No. 238 for the year 1897, this last Act applies in express terms to banks and trust companies whose business is being liquidated and dissolved; and provides that the people of the State of Michigan shall receive by escheat all deposits of money or securities in possession or control of such banks or trust companies, for which deposits no demand has been made within the period during which a claim or demand is by law or by decree required to be made by depositors, or which have been unclaimed for a period of seven years and regarding which a depositor has had no dealings with the bank or trust company, or its receiver, custodian, or liquidating agent, for seven years from the date of last deposit. The statute provides that the State Public Administrator, at any time after six months from the appointment of a liquidating agent, shall formally demand of the receiver the transfer of such escheated deposits, with proper dividends thereon, and "it shall thereupon be the duty of such receiver, custodian or liquidating agent to transfer all such escheated deposits to the name and account of the 'board of escheats of the state of Michigan.'" It is expressly stated that "the formal demand shall enumerate the individual deposits, and no proof of claim shall be necessary to be filed for each individual deposit, and payment of dividends may be made in a lump sum of more than one escheated deposit, if deemed advisable." County Public Administrators may be engaged to assist the State Administrator, and shall be allowed, out of escheated deposits, all necessary expenses of administration, together with such allowances for regular and extraordinary services as are authorized to be paid to administrators in the Probate Courts of Michigan. The Act cuts off depositors of escheated funds, their heirs or assigns from any greater rights against the people of the State of Michigan than they would have had against the liquidating agent of the bank or trust company which was in possession or control of the escheated deposits enumerated in the Act.

These Michigan statutes of escheat should be considered *in entirety,* with respect to the issues in this case. Repeal of an earlier statute by a later enactment will be implied only insofar as the latter conflicts with the former, or is manifestly intended as a substitute for the earlier law. Posadas v. National City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351.

(I) It was the judgment of the district court that the Receiver of the First National Bank-Detroit must account to the plaintiff-appellant, as required by the Michigan statutes, for all deposits belonging to persons who have not had any dealings with the First National Bank-Detroit, for a period of seven years prior to February 11, 1933, the date of the insolvency and suspension of the bank; but that any deposits with respect to which such inactive seven-year period expired after the date of the bank's suspension shall be distributed by the Receiver in accordance with Section 194, Title 12, U.S.C.A. The State of Michigan has appealed from this ruling, the pecuniary effect of which would allow only a small percentage of the claimed deposits to be taken over by the State under the Michigan laws of escheat.

Citing White v. Knox, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603, and Merrill v. National Bank of Jacksonville, 173 U.S. 131, 133, 19 S.Ct. 360, 43 L.Ed. 640, the Receiver insists that Act No. 45, approved April 6, 1933, and Act No. 171, approved June 28, 1933, cannot be retroactively applied to change the situation existing on February 11, 1933, the date of the bank's suspension, so as to effectuate the escheat of dormant deposits. Each of these 1933 acts relates to depositors who have had no dealings with the bank for a continuous period of seven years. Section 13464 of the Compiled Laws of Michigan for 1929, which was in effect on the date of the bank's suspension, also relates to a depositor who has had no dealings concerning his account with the bank within seven years from the date of his last deposit.

In our view, it is unnecessary that the Receiver establish his contention as to non-retroactivity of the statutes enacted after

the bank was taken over by the Comptroller. A depositor could make no withdrawals from or deposits to his account after the bank suspended on February 11, 1933. He could have no further active dealings with the bank. His action was limited to filing a claim in receivership. Consequently, the running of the added time necessary to total the required seven years essential in all three statutes as a predicate to escheat action was necessarily stopped simultaneously with the suspension of the bank. Inactivity of the depositor for seven years, due to other causes than operation of law, is a *conditio sine qua non* of all the statutes upon which any right of escheat must essentially rest.

■ (II) In the original brief filed by a former attorney general on behalf of the State of Michigan, it was conceded that the Michigan statutes of escheat do not apply to inactive accounts of corporations, or other artificial associations; but it was contended that these laws do apply to partnership accounts. The present state attorney general, in a reply brief for appellant, withdraws the concession made by his predecessor. The District Court decreed correctly that the Receiver is not required to account to the plaintiff-appellant for the inactive accounts of corporations, associations, or partnerships, nor for unsurrendered negotiable instruments, such as certificates of deposit, cashier's checks, certified checks, and drafts on correspondent banks.

Only accounts of natural persons can be subject to escheat under the Michigan laws. The plain language of these statutes precludes their application to artificial persons.

■ Nor could the acts, if at all applicable to National Banks, be applied to partnership deposits. By the mandate of the Michigan statute (2 Comp.Laws 1929, Sec. 9869 et seq.), partnership assets are to be administered by the surviving partner and not by the Probate Court administering the deceased partner's estate. Kent Probate Judge v. Employers Insurance Company, 283 Mich. 328, 278 N.W. 85.

It is stipulated in the record that among the unproven deposit balances, for which no claims have been presented to the Receiver, there are nine thousand, four hundred twenty-five outstanding and unsurrendered certificates of deposit, cashier's checks, certified checks, drafts on correspondent banks, and Christmas Club checks,

in the approximate sum of $326,062.48. (The total includes some garnisheed accounts.)

Obviously, the Receiver cannot be expected to know whether these items have been frozen in the hands of the original holders, who are dead or missing, or whether they are in the hands of living holders for value.

■ If he should pay over to the state of Michigan the funds called for by these documents, the Receiver would be defenseless against holders in due course, who, in the future, demand payment of their proportionate dividends upon seasonable presentation of the negotiable instruments. Nor could he recoup against the Board of Escheats of the State of Michigan under Section 13477 of the Compiled Laws of Michigan, 1929; for that indemnification law in very terms applies only to the heirs or assigns of a depositor, and a holder for value is neither the heir nor the assign of a deceased person.

The lower court rightly adjudged that the Receiver is not required to account to the State of Michigan for these unsurrendered negotiable instruments.

(III) We turn now to discussion of the interesting questions in the case.

By cross-appeal, the Receiver of the First National Bank-Detroit takes the position that (1) escheat statutes are inapplicable to insolvent national banks; and (2) that the escheat procedure in Michigan is invalid and contrary to the due process clauses of the Constitution of Michigan, Article II, Section 16, and the Constitution of the United States. Amend 14.

The Receiver insists that under inflexible provisions of the National Bank Act, all funds ultimately collected by the receiver of an insolvent national bank appointed by the Comptroller of the Currency must be distributed pro rata to the creditors and depositors of the bank who have properly proved their claims, until they have been paid in full as to both principal and interest, and then any remaining surplus should be turned over to the shareholders. 12 U.S.C.A. §§ 191, 192, 193, 194, 197, 264(m) (3).

Section 194 directs that "the comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the pro-

ceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held."

The analogy is pointed that as a general rule in the instances of bankrupts' and decedents' estates and equity receiverships, distribution is made only to those creditors who have filed properly and proved claims as required.

The Attorney General of Michigan replies that the sections of the federal code covering liquidation of insolvent national banks afford no protection to persons lawfully entitled to unclaimed deposits which have remained inactive for as long as seven years; and that, therefore, the field occupied by the state escheat laws is open to the reasonable exercise of state sovereignty.

In rejoinder, the Receiver asserts that the National Bank Act furnishes a complete, exclusive and exhaustive system for the liquidation of insolvent national banks; (Cook County National Bank v. United States, 107 U.S. 445, 2 S.Ct. 561, 27 L.Ed. 537; Davis v. Elmira Savings Bank, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700; Grindley v. First National Bank-Detroit, 6 Cir., 87 F.2d 110, 112) and that it was the lawful intent of Congress that no state escheat laws should prevent the distribution of unclaimed deposits in insolvent national banks to creditors who have proved their claims as prescribed by the National Bank Act.

It is true that as early as National Bank v. Commonwealth, 9 Wall. 353, 76 U.S. 353, 362, 19 L.Ed. 701, the Supreme Court said that national banks "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation," and "it is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." See, also, McClellan v. Chipman, 164 U.S. 347, 17 S.Ct. 85, 41 L.Ed. 461; First National Bank v. Missouri, 263 U.S. 640, 656, 44 S.Ct. 213, 68 L.Ed. 486; Davis v. Elmira Savings Bank, 161 U.S. 275, 283, 16 S.Ct. 502, 40 L.Ed. 700; Waite v. Dowley, 94 U.S. 527, 533, 24 L.Ed. 181.

But the National Bank Act constitutes, in itself, a complete system for the establishment and government of national banks, and directs the manner of winding up such institutions and the distribution of their effects, "neither limited nor enlarged by other statutory provisions with respect to the settlement of demands against insolvents or their estates." Cook County National Bank v. United States, 107 U.S. 445, 448, 2 S.Ct. 561, 564, 27 L.Ed. 537. National Banks, being instrumentalities of the federal government, are immune from such attempted state control as would conflict with the laws of the United States, or either frustrate the purpose of the national legislation or impair the efficiency of national banks to discharge their statutory duties. Davis v. Elmira Savings Bank, supra.

First National Bank of San Jose v. State of California, 262 U.S. 366, 43 S.Ct. 602, 67 L.Ed. 1030, held that a statute of California, escheating to the State bank deposits which have remained intact and unclaimed for more than twenty years when no notice of residence has been given the bank by the depositor or any claimant, conflicts with laws of the United States touching national banks, and is therefore invalid. The Receiver insists that the authority of this case is decisive and controlling upon the issue that the Michigan escheat procedure, if applied in the instant case, would constitute an unwarranted and invalid interference with the discharge of its statutory duties by a national bank.

Against this insistence, we have considered the differentiation that in the San Jose case the national bank concerned was in *operation* and not in *liquidation* as is the national bank involved here; and that the California statute prescribed no procedure of the character established by the Michigan statutes for the administration of the estates of dormant depositors.

We have also given due weight to the argument that the Supreme Court of Michigan has declared that escheat proceedings under Michigan laws are not solely for the benefit of the state, but are also designed for the conservation by the state of the property possessed for the benefit of any person lawfully entitled subsequently to receive it. Braun v. McPherson, 277 Mich. 396, 403, 269 N.W. 211. But see the recent opinion (Feb. 19, 1941) of the Circuit Court of Ingham, Michigan, in No. 20656 in Chancery, Evans Products Company v. Dunckel, State Treasurer, holding invalid certain parts of the Michigan Escheat Statutes, as amended in 1939.

We are aware that it has been held in the Ninth Circuit that a statute of Alaska, requiring banks in possession of escheated property to report to the attorney general necessary information for judicial proceedings, was not an unwarranted and invalid interference with the business of a national bank; and that the Court of Appeals quoted as follows from Security Savings Bank v. California, 263 U.S. 282, 286, 44 S.Ct. 108, 68 L.Ed. 301, 31 A.L.R. 391: "The contract of deposit does not give the bank a tontine right to retain the money in the event that it is not called for by the depositor. It gives the bank merely the right to use the depositor's money until called for by him, or some other person duly authorized. If the deposit is turned over to the state in obedience to a valid law, the obligation for the bank to the depositor is discharged."

We have experienced difficulty in our effort to determine the full meaning of the language of the Supreme Court in Provident Institution for Savings v. Malone, 221 U.S. 660, 665, 31 S.Ct. 661, 663, 55 L.Ed. 899, 34 L.R.A.,N.S., 1129, where it was held that a statute directing that deposits in savings banks, where the accounts have been inactive for thirty years and the depositors cannot be found, be turned over to designated state officers with provisions for the payment of the money to the depositors or their heirs on establishment of right to the funds, does not deprive such savings banks of their property without due process of law. The Court said: "Neither the charter nor the by-laws create anything in the nature of a tontine, under which, on dissolution of the corporation, the then depositors would receive the money of those absent and unknown. On dissolution, the shares of a depositor, who could not be found, would be paid over to his legal representative, who might be an administrator in case his death was established, or a guardian, in case of mental incapacity, or a trustee in bankruptcy in case of insolvency, or a representative appointed under statutes applicable to abandoned property."

We have observed that in First National Bank v. Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486, the doctrine was reiterated that national banks are subject to state laws which do not interfere with the purposes of their creation, or tend to impair or destroy their efficiency as federal agencies, or conflict with the paramount law of the United States.

United States v. Klein, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840, urged upon us by the Michigan Attorney General has been given our thoughtful attention, though not found in point.

But, after careful consideration of the authorities mentioned, we have reached the conclusion that none of these cases gainsay the direct and controlling applicability to the instant situation of the doctrine of First National Bank of San Jose v. California, supra, impelling decision that Michigan escheat procedure, as heretofore detailed, constitutes an unlawful interference with the liquidation of a national bank.

The rationale of its decision was thus stated by the Supreme Court in the San Jose case, supra (262 U.S. pages 369, 370, 43 S.Ct. page 603, 67 L.Ed. 1030):

"Plainly, no state may prohibit national banks from accepting deposits, or directly impair their efficiency in that regard. And we think, under circumstances like those here revealed, a state may not dissolve contracts of deposit even after 20 years and require national banks to pay to it the amounts then due; the settled principles stated above oppose such power.

"Does the statute conflict with the letter or general object and purposes of the legislation by Congress? Obviously, it attempts to qualify in an unusual way agreements between national banks and their customers long understood to arise when the former receive deposits under their plainly granted powers. If California may thus interfere other States may do likewise; and, instead of 20 years, varying limitations may be prescribed—3 years perhaps, or 5, or 10, or 15. We cannot conclude that Congress intended to permit such results. They seem incompatible with the purpose to establish a system of governmental agencies specifically empowered and expected freely to accept deposits from customers irrespective of domicile with the commonly consequent duties and liabilities. The depositors of a national bank often live in many different states and countries, and certainly it would not be an immaterial thing if the deposits of all were subject to seizure by the state where the bank happened to be located. The success of almost all commercial banks depends upon their ability to obtain loans from depos-

itors, and these might well hesitate to subject their funds to possible confiscation.

"This court has often pointed out the necessity for protecting federal agencies against interference by state legislation." (Citing authorities.)

A State Supreme Court in our circuit recently followed the authority of the San Jose case and denied, in its applicability to national banks, the constitutionality of a statute requiring the delivery to the state of all bank deposits which have remained inactive for fifteen years, or, in the case of savings funds and time deposits, for twenty-five years. American National Bank of Nashville v. Clarke, Sup't of Banks, decided February 3, 1940, 175 Tenn. 480, 135 S.W.2d 935. Compare National City Bank of New York v. Philippine Islands, 302 U.S. 651, 58 S.Ct. 269, 82 L.Ed. 504, which also cited and followed the San Jose bank case, supra.

The necessity for applying the doctrine of the San Jose case is even more apparent from the attitude of the State of Michigan in its deliberate failure to follow the procedure prescribed by Act 205 of Michigan for 1925, with respect to the estates of missing persons.

In consequence of the opinion in Beckwith v. Bates, 228 Mich. 400, 200 N.W. 151, 37 A.L.R. 819, holding that under Michigan law before the enactment of Act 205 in 1925, a probate court had no jurisdiction to administer the estate of a missing person for purposes of escheat, Act 205 became the sole source of authority in Michigan for the escheat of the property of a person missing or presumed to be dead. To discard the due process of law prescribed in that Act and to rely entirely upon the retrospective Acts 40, 45 and 171 of Michigan for 1933, seems to bring the effort of the Attorney General to escheat deposits in a national bank within the plain condemnation of the San Jose bank case, because these last three Michigan statutes resemble the invalid California Act in being closer kin to illegitimate laws of forfeiture than to legitimate laws of escheat.

For the foregoing reasons, the judgment of the district court is reversed, and this cause is remanded for entry of judgment in conformity with this opinion.