*537 Justice Thomas,
with whom The Chief Justice, Justice Kennedy, and Justice Alito join, concurring in part and dissenting in part.
The Court holds that the term “visitorial powers” as used in the National Bank Act (NBA), 12 U. S. C. § 484(a), refers only “to a sovereign’s supervisory powers over corporations,” which are limited to “administrative oversight” including “inspect[ion of] books and records on demand.” Ante, at 535. Based on this definition, the Court concludes that § 484(a) does not pre-empt a “state attorney generalas] ... suit to enforce state law against a national bank.” Ante, at 536. I would affirm the Court of Appeals’ determinations that the term “visitorial powers” is ambiguous and that it was reasonable for the Office of the Comptroller of the Currency (OCC) to interpret the term to encompass state efforts to obtain national bank records and to enforce state fair lending laws against national banks. Accordingly, I respectfully concur in part and dissent in part.
I
A
The NBA provides that “[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.” 12 U. S. C. § 484(a). Through notice- and-comment rulemaking, OCC issued a regulation defining “visitorial powers” as including: “(i) Examination of a bank; (ii) Inspection of a bank’s books and records; (iii) Regulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) Enforcing compliance with any applicable federal or state laws concerning those activities.” 12 CFR § 7.4000(a)(2) (2005). OCC further *538 concluded that 12 U. S. C. §484(a)’s “vested in the courts of justice” exception pertains only to the “powers inherent in the judiciary and does not grant state or other governmental authorities any right to inspect, superintend, direct, regulate or compel compliance by a national bank with respect to any law, regarding the content or conduct of activities authorized for national banks under Federal law.” 12 CFR § 7.4000(b)(2). The Court of Appeals upheld OCC’s regulation as reasonable. See 510 F. 3d 105 (CA2 2007).
This Court’s decision in Chevron U S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984), provides the framework for deciding this case. “In Chevron, this Court held that ambiguities in statutes within an agency’s jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.” National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 980 (2005). Accordingly, “[i]f a statute is ambiguous, and if the implementing agency’s construction is reasonable, Chevron requires a federal court to accept the agency’s construction of the statute, even if the agency’s reading differs from what the court believes is the best statutory interpretation.” Ibid.
OCC is “the administrator charged with supervision of the [NBA],” NationsBank of N. C., N. A. v. Variable Annuity Life Ins. Co., 513 U. S. 251, 256 (1995), and it acted through notice-and-comment rulemaking procedures in promulgating the regulation at issue in this case, see 69 Fed. Reg. 1895 (2004). As a result, 12 CFR § 7.4000 falls within the heartland of Chevron. See United States v. Mead Corp., 533 U. S. 218, 229-230 (2001); see also, e. g., Smiley v. Citibank (South Dakota), N. A., 517 U. S. 735, 739 (1996) (deferring to OCC’s interpretation of the term “ ‘interest’ ” in the NBA). “It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering,” and “that practice extends to the judgments of the Comptroller of the Cur *539 reney with regard to the meaning of the banking laws.” Ibid. The majority does not disagree. See ante, at 525. As a result, the only disputed question is whether the statutory term “visitorial powers” is ambiguous and, if so, whether OCC’s construction of it is reasonable.
B
The majority concedes that there is “some ambiguity as to the meaning of the statutory term Visitorial powers.’” Ibid. Yet it concludes that OCC’s interpretation of § 484(a) is not entitled to deference because the Court “can discern the outer limits of the term Visitorial powers’ even through the clouded lens of history” and these outer definitional limits “do not include . . . ordinary enforcement of the law.” Ibid. I cannot agree. The statutory term “visitorial powers” is susceptible to more than one meaning, and the agency’s construction is reasonable.
Because the NBA does not define “visitorial powers,” the ordinary meaning of the words chosen by Congress provides the starting point for interpreting the statute. See Dean v. United States, 556 U. S. 568, 572 (2009) (“We start, as always, with the language of the statute” (internal quotation marks omitted)); Asgrow Seed Co. v. Winterboer, 513 U. S. 179, 187 (1995) (“When terms used in a statute are undefined, we give them their ordinary meaning”). In 1864, when the NBA was enacted, “visitation” was generally defined as “[ijnspection; superintendence; direction; [and] regulation.” 2 A. Burrill, A Law Dictionary and Glossary 598 (2d ed. 1860); see also 2 J. Bouvier, A Law Dictionary 633 (rev. 4th ed. 1852) (defining “visitation” as “[t]he act of examining into the affairs of a corporation”). With respect to civil corporations, “visitation” was conducted “by the government itself, through the medium of the courts of justice.” Id., at 634. The Court has previously looked to these definitions in examining the meaning of “visitorial powers” for purposes of the NBA. See Guthrie v. Harkness, 199 U. S. 148, 158 (1905).
*540 OCC’s interpretation of “visitorial powers” to include both “[Regulation and supervision of activities authorized or permitted pursuant to federal banking law” and “[e]nforcing compliance with any applicable federal or state laws concerning those activities,” 12 CFR §§ 7.4000(a)(2)(iii), (iv), fits comfortably within this broad dictionary definition of “visitation.” And, in turn, petitioner’s demand for nonpublic information to force national banks to comply with state fair lending laws under threat of judicial action would appear to qualify as an attempt to “superinten[d]” the banks’ federally authorized operations “through the medium of the courts of justice.” See Burrill, supra, at 598; Bouvier, supra, at 634.
On the other hand, as the majority concludes, “visitorial powers” could be limited to conducting examinations of national banks or otherwise interfering with their internal operations. To support this argument, the majority briefly alludes to the common-law history of visitation. See ante, at 525-526; see also United States v. Shabani, 513 U. S. 10, 13 (1994) (“[A]bsent contrary indications, Congress intends to adopt the common law definition of statutory terms”). In so doing, the majority fully accepts petitioner’s argument that “Congress invoked a then-familiar common law term of corporate governance — visitation—to clarify that the States, traditionally the supervisors of private corporations doing business within their jurisdictions, had no authority to examine the condition of a national bank, respond to any perceived financial risk, or hold the bank to its charter or the laws of its creation.” Brief for Petitioner 21-22. Under the majority’s view, any construction of § 484(a) that fails to preserve the right of the States to enforce through judicial action their generally applicable laws against national banks is unreasonable and, therefore, not entitled to deference. See ante, at 528-529.
But contrary to the majority’s determination, the common-law tradition does not compel the conclusion that petitioner’s definition of visitation is the only permissible in *541 terpretation of the term. Indeed, a more thorough examination of §484(a)’s common-law ancestry suggests the opposite. As the majority notes, see ante, at 525-526, the concept of visitation originated in Roman and canon law in which the term was used to describe the church hierarchy’s authority over its own institutions, see Pound, Visitatorial Jurisdiction Over Corporations in Equity, 49 Harv. L. Rev. 369, 369-370 (1936). The practice of visitation later expanded to include the supervision of charities, universities, and civil corporations. Ibid.
With respect to churches, charities, and universities, a visitor’s duties were narrow. In the university setting, for example, the “power of the visitor [was] confined to offences against the private laws of the college; he ha[d] no cognizance of acts of disobedience to the general laws of the land.” 2 S. Kyd, Law of Corporations 276 (1794) (emphasis in original). The visitor’s duties were equally narrow in the governance of ecclesiastical and charitable institutions. See 1 W. Blackstone, Commentaries on the Laws of England 467-472 (1765); Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 673-677 (1819) (Story, J., concurring). If the sweep of a visitor’s authority with respect to civil corporations was the same, the majority would have a stronger argument that the “visitorial powers” prohibition was similarly limited. See ante, at 525-526. However, the common-law tradition instead suggests that visitorial powers were broader with respect to civil corporations, including banks.
Historically, visitorial authority over civil corporations was exercised only by the sovereign who had broad authority to assure compliance with generally applicable laws. See Blackstone, supra, at 469 (“The king being thus constituted by law the visitor of all civil corporations, the law has also appointed the place, wherein he shall exercise this jurisdiction: which is the court of king’s bench; where, and where only, all misbehaviors of this kind of corporations are enquired into and redressed, and all their controversies de *542 cided”); 2 J. Kent, Commentaries on American Law 241 (1827) (explaining that “visitation of civil corporations is by the government itself, through the medium of the courts of justice”). “Civil corporations, whether public, as the corporations of towns and cities; or private, as bank, insurance, manufacturing, and other companies of the like nature, are not subject to [private] visitation. They are subject to the general law of the land, and amenable to the judicial tribunals for the exercise and the abuse of their powers.” Id., at 244; see also J. Angelí & S. Ames, Law of Private Corporations §684, p. 680 (rev. 4th ed. 1852) (“Civil corporations, whether public or private, being created for public use and advantage, properly fall under the superintendency of that sovereign power whose duty it is to take care of the public interest; whereas, corporations, whose object is the distribution of a private benefaction, may well find jealous guardians in the zeal or vanity of the founder, his heirs, or appointees”).
States have traditionally exercised their visitorial powers over civil corporations by invoking the authority of the judiciary to “compel domestic corporations or their officers to perform specific duties incumbent on them by reason of their charters, or under statutes or ordinances or imposed by the common law.” Pound, supra, at 375 (emphasis added); see also S. Merrill, Law of Mandamus § 158, p. 194 (1892) (explaining that “under the visitorial power of the state, any breach of duty by a private corporation may be corrected by” the writ of mandamus and that the duty “may be imposed by [the corporation’s] charter, by the general statutes, or by the common law” (footnotes omitted)). As Merrill explained, such actions were employed to compel common carriers and certain other civil corporations to adhere to “statutory or common law” duties, including the duty to “exten[d] to all without discrimination the use of their services.” Id., § 162, at 200; see also J. Grant, A Practical Treatise on the Law of Corporations in General, As Well Aggregate as Sole 262 *543 (1854) (explaining that mandamus was available when corporations “refuse[d] to perform a duty cast upon them by the law of the land”).[1]
Even before enactment of the NBA, several States enacted laws granting banking commissioners specific authority to investigate compliance with generally applicable laws and to use the courts to ensure observance therewith. See, e. g., Act of Feb. 23, ch. 14, § 2,1838 Mass. Acts p. 303 (authorizing banking commissioners to “visit” a bank and “examine all [its] affairs” to determine whether it had “complied with the provisions of law applicable to [its] transactions”); Act of May 14, eh. 363, §12, 1840 N. Y. Laws pp. 307-308 (authorizing banking commissioners to bring judicial actions against banks “found to have violated any law of this state ... in the same manner and with the like effect as any incorporated bank may be proceeded against for a violation of its *544 charter”). Indeed, Congress modeled the NBA after New York’s supervisory regime. See J. Knox, A History of Banking in the United States 422 (1903) (reprint 1969).
Petitioner contends, and the majority agrees, that this understanding of the common law confuses the sovereign’s “enforcement of general laws that apply equally to all actors within a State, like the ban on discrimination found in New York Executive Law § 296-a” with “an exercise of visitorial powers.” Brief for Petitioner 24; see also ante, at 529 (concluding that “a sovereign’s Visitorial powers’ and its power to enforce the law are two different things”). But this narrow conception of visitorial powers does not fully capture the common law. In a section entitled “Visitorial power,” one treatise explained that “[a]s a general rule the state has the same control, in this respect, over corporations that it has over individuals.” C. Elliott, Law of Private Corporations §90, p. 80 (rev. 3d ed. 1900); see also 1 S. Thompson, Commentaries on the Law of Private Corporations § 475, p. 580 (J. Thompson rev. 2d ed. 1908) (“In its visitorial capacity the state checks and controls corporate affairs, even for the protection of those who deal with them”). If the sovereign’s power of visitation was limited to oversight of “corporate affairs,” visitation would not parallel the sovereign’s control over individuals or allow the sovereign to protect through judicial action the rights of individuals who “deal with” the corporation. See ibid.
The Wisconsin Supreme Court’s decision in Attorney General v. Chicago & Northwestern R. Co., 35 Wis. 425 (1874)— which has been referred to as “the leading American case for the visitorial jurisdiction of equity,” Pound, 49 Harv. L. Rev., at 380 — illustrates the point. In that case, the state attorney general sought a writ of injunction to “restrain the two defendant companies from exacting tolls for the carriage of passengers or freight in excess of the maximum rates established by” Wisconsin law, 35 Wis., at 432. The attorney general “applied] for the writ on behalf of the public,” id., *545 at 531, in order “‘to correct abuses and save the rights of the people,’ ” id., at 572. The court found that the attorney general’s visitorial power included enforcement of generally applicable law against civil corporations through courts of equity. See id,., at 529-530. As the court explained, the common-law understanding of visitorial powers had expanded beyond its ecclesiastical roots to include such authority. See id., at 530 (“The grounds on which this jurisdiction rests are ancient; but the extent of its application has grown rapidly of late years, until a comparatively obscure and insignificant jurisdiction has become one of great magnitude and public import”).
As a result, the majority’s conclusion that when “a state attorney general brings suit to enforce state law against a national bank, he is not acting in the role of sovereign-as-supervisor, but rather in the role of sovereign-as-law-enforcer,” ante, at 536, cannot be reconciled with this leading case or the general common-law understanding on which the decision rests. At common law, all attempts by the sovereign to compel civil corporations to comply with state law — whether through administrative subpoenas or judicial actions — were visitorial in nature. Thus, even if the sovereign’s law enforcement and visitorial powers were at one time distinct, by common law, they had merged at least with respect to the enforcement of generally applicable public laws against civil corporations. See Thompson, supra, § 460, at 556 (“The police power, in its visitorial aspect, as exercised by congress and the several states, extends to the minutest details of the banking business” (emphasis added)). By construing visitation so narrowly, the majority implicitly rejects the efforts of William Blackstone, James Kent, and Roscoe Pound, see supra, at 541-542, in elucidating the historical meaning of this concept. Like OCC, each of these venerable legal scholars understood visitation of civil corporations to include the power to enforce generally applicable laws through judicial actions. See ibid.
*546 In the end, OCC was presented with a broad dictionary definition of “visitation” and a common-law history suggesting that the scope of the visitor’s authority varied in accordance with the nature of the organization under supervision. It is possible that the “visitorial powers” are narrower than OCC concluded. But a visitor’s powers could also be broader. There is support for the proposition that visitation includes enforcement of all generally applicable laws. See supra, at 540-545 and this page. OCC instead interpreted “visitorial powers” to prohibit only enforcement of laws concerning “activities authorized or permitted pursuant to federal banking law.” 12 CFR §§7.4000(a)(2)(iii) and (iv). States are thus free to enforce applicable laws that do not regulate federally authorized banking activities, see § 7.4000(a)(3), “including, for example, criminal, tax, zoning, and labor and employment laws,” Brief for Federal Respondent 15 (citing 69 Fed. Reg. 1896).
Thus, although the text and history of visitation do not authoritatively support either party’s construction of the statute, OCC’s decision to adopt a more modest construction than could have been supported by the common-law and dictionary definition reinforces the reasonableness of its regulation. Put simply, OCC selected a permissible construction of a statutory term that was susceptible to multiple interpretations.
C
Petitioner nonetheless argues that the original structure of the NBA compels us to adopt his reading of “visitorial powers.” When enacted in 1864, the “visitorial powers” clause was preceded by a statutory provision directing the Comptroller of the Currency to appoint persons “to make a thorough examination into all the affairs of [every banking] association” and to “make a full and detailed report of the condition of the association to the comptroller.” Act of June 3,1864, ch. 106, § 54,13 Stat. 116. In addition, the “visitorial powers” clause was succeeded by a sentence concerning the *547 compensation due to the examiners. See ibid. Petitioner contends that the placement of the “visitorial powers” clause between these two provisions indicates that it originally meant to ban States only from conducting the particular type of “thorough examination” of banking affairs described in the neighboring provisions. And, petitioner adds, §484 currently resides in the subchapter of the statute entitled “Bank Examinations,” which still includes a provision directing the Comptroller to appoint examiners “to make a thorough examination of all the affairs of the bank and . . . make a full and detailed report of the condition of said bank to the Comptroller of the Currency.” 12 U. S. C. §481.
Petitioner’s argument is undermined, however, by other structural attributes of this subchapter. In § 484(b), for example, Congress provided that “[notwithstanding” the statute’s visitorial-powers prohibition, “State auditors and examiners may . . . review [a national bank’s] records solely to ensure compliance with applicable State unclaimed property or escheat laws.” Such review does not fall within petitioner’s definition of “visitorial powers” because the enforcement of state property laws is in no way associated with national bank examinations or internal operations. Thus, were § 484(a) to have the meaning petitioner assigns, there would have been no reason for Congress to identify the § 484(b) authority as an exception to §484(a)’s “visitorial powers” prohibition, as the authority granted in § 484(b) would never have been eliminated by § 484(a).
Other exceptions in § 484 also support OCC’s construction of the statute. For example, § 484(a) includes an exception for visitations “authorized by Federal law.” One type of visitation authorized by law is described in 26 U. S. C. § 3305(c), which provides that “[n]othing contained in [§ 484] shall prevent any State from requiring any national” bank to provide payroll records and reports for unemployment tax purposes. Similarly, 12 U. S. C. § 62 permits state tax officials to inspect national bank shareholder lists. Both provisions would be *548 unnecessary if “visitorial powers” were limited to bank examinations and internal operations.
In sum, the NBA’s structure does not compel the construction of § 484(a)’s text that petitioner advocates. If anything, given the manner in which Congress crafted exceptions to the “visitorial powers” ban in the statute, the opposite is true.[2]
D
The majority also accepts petitioner’s contention that OCC’s construction of “visitorial powers” is unreasonable because it conflicts with several of this Court’s decisions. See ante, at 526-529. But petitioner cannot prevail by simply showing that this Court previously adopted a construction of § 484 that differs from the interpretation later chosen by the agency. “A court’s prior judicial construction of a statute trumps an agency construction otherwise entitled to *549 Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.” Brand X, 545 U. S., at 982. These decisions do not construe § 484 in a manner that trumps OCC’s regulation.
This Court’s only decision directly addressing the meaning of “visitorial powers” is Guthrie, which held that the NBA did not prohibit a suit brought by a private shareholder seeking to inspect the books of a national bank, 199 U. S., at 157. In so holding, the Court contrasted “the private right of the shareholder to have an examination of the business in which he is interested” with a visitor’s “public right” to examine “the conduct of the corporation with a view to keeping it within its legal powers.” Id., at 158-159. Guthrie thus draws a line between enforcement of private rights and the public act of visitation that is consistent with the definition of visitation embraced by OCC. See id., at 158 (“In no ease or authority that we have been able to find has there been a definition of this right, which would include the private right of the shareholder to have an examination of the business in which he is interested . . . ”). The agency has never taken the position that the “visitorial powers” prohibition extends to private action.
Nor does this Court’s decision in First Nat. Bank in St. Louis v. Missouri, 263 U. S. 640 (1924) (St. Louis), foreclose OCC’s construction of the statute. In that case, the State of Missouri brought a quo warranto proceeding in state court “to determine [the national bank’s] authority to establish and conduct a branch bank in the City of St. Louis.” Id., at 655. The Court first held that federal law did not authorize national banks to engage in branch banking. See id., at 656-659. “Having determined that the power sought to be exercised by the bank finds no justification in any law or authority of the United States,” the Court then concluded that “the way is open for the enforcement of the state statute.” Id., at 660.
*550 Petitioner contends, and the majority agrees, see ante, at 527-528, and n. 2, that St. Louis stands for the proposition that a State retains the right to enforce any state law that is not substantively pre-empted with respect to national banks, see 263 U. S., at 660 (“To demonstrate the binding quality of a statute but deny the power of enforcement involves a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law. . . . What the State is seeking to do is to vindicate and enforce its own law . . . ”). Under this view, then, because the New York fair lending laws are not substantively pre-empted, he is not exercising “visitorial powers” by enforcing them.
Respondents counter that the holding of St. Louis is not so broad. In their view, the Court held only that a State may enforce its laws against a national bank when federal law grants the bank no authority to engage in the underlying activity at issue. See Brief for Respondent Clearing House Association 33-34. Here, federal law expressly authorizes national banks to make mortgage loans. See 12 U. S. C. § 371(a). Thus, unlike in St. Louis — in which the relevant state-law-proscribed conduct in a category that was wholly beyond the powers granted to national banks — petitioner seeks to superintend the manner in which the national banks engage in activity expressly authorized by federal law. According to respondents, then, § 484(a)’s ban on unauthorized visitation provides the “controlling reason” forbidding state enforcement that was absent from St. Louis, see 263 U. S., at 660.
. There is no need to decide which party has the better argument. The St. Louis decision nowhere references § 484(a) or addresses “visitorial powers.” Thus, as noted above, even if the decision is best read to support petitioner’s view of the statute, that conclusion is insufficient to deny Chevron deference to OCC’s construction of § 484(a). “Since Chevron teaches that a court’s opinion as to the best reading of an *551 ambiguous statute an agency is charged with administering is not authoritative, the agency’s decision to construe that statute differently from a court does not say that the court’s holding was legally wrong. Instead, the agency may, consistent with the court’s holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes.” Brand X, supra, at 983. A judicial decision that fails to directly confront the provision at issue cannot be deemed to have adopted the “authoritative” construction of the statute.[3] Petitioner’s reliance on other decisions of this Court is misplaced for this very same reason. See First Nat. Bank in Plant City v. Dickinson, 396 U. S. 122 (1969); Anderson Nat. Bank v. Luckett, 321 U. S. 233 (1944); First Nat. Bank of Bay City v. Fellows, 244 U. S. 416 (1917); Easton v. Iowa, 188 U. S. 220 (1903); Waite v. Dowley, 94 U. S. 527 (1877); National Bank v. Commonwealth, 9 Wall. 353 (1870). None of these decisions addressed the meaning of “visitorial powers” for purposes of § 484(a), let alone provided a definitive construction of the statute.
*552 Finally, this Court’s decision in Watters v. Wachovia Bank, N. A., 550 U. S. 1 (2007), supports OCC’s construction of the statute. Watters addressed whether the NBA pre-empted the application of certain Michigan laws to the mortgage-lending activities of an operating subsidiary of a national bank. See id., at 7-8. In deciding that issue, the Court did not reach the question presented here. But the Court was fully aware that the Michigan statutes granted state banking commissioners the very enforcement authority that petitioner seeks to exert over the national banks in this case. See id., at 9-10 (citing Mich. Comp. Laws Ann. §§445.1661 (West 2002), 493.56b (West Supp. 2005)); see also 550 U. S., at 34 (Stevens, J., dissenting) (describing §§445.1661 and 493.56b as “state visitorial oversight”).[4]
As the Court explained, although “the Michigan provisions at issue exempted] national banks from coverage . . . [t]his [was] not simply a matter of the Michigan Legislature’s grace. For, as the parties recognize, the NBA would have preemptive force, i. e., it would spare a national bank from state controls of the kind here involved.” Id., at 13 (citations omitted); see ibid, (explaining that “real estate lending, when conducted by a national bank, is immune from state visitorial control”). The Court’s conclusion in Watters that § 484(a) deprives the States of inspection and enforcement authority over the mortgage-lending practices of national *553 banks lends weight to the agency’s construction of the statute.
II
Petitioner also argues that three different background principles trigger a clear-statement rule that overcomes any Chevron deference to which OCC’s construction of § 484 otherwise might be entitled. I disagree. None of petitioner’s arguments provide a doctrinal basis for refusing to defer to the agency’s reasonable construction of this statute.
First, petitioner contends that OCC’s regulation, which interprets § 484(a) to pre-empt state enforcement of state law but not the substantive state law itself, undermines important federalism principles and therefore triggers a requirement thát Congress clearly state its pre-emptive intentions, see Gregory v. Ashcroft, 501 U. S. 452, 460 (1991) (“[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute” (internal quotation marks omitted; alteration in original)). Petitioner is incorrect because OCC’s construction of the statute does not alter the balance of power established by the Constitution.
National banks are created by federal statute and therefore are subject to full congressional control. The States “can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit.” Farmers’ and Mechanics’ Nat. Bank v. Dearing, 91 U. S. 29, 34 (1875); see also Watters, 550 U. S., at 10 (“Nearly 200 years ago, in McCulloch v. Maryland, 4 Wheat. 316 (1819), this Court held federal law supreme over state law with respect to national banking”). As a result, the only question presented by this case is whether Congress has seen it “proper to permit” the States to enforce state fair lending laws against national banks. OCC’s reasonable conclusion that § 484(a) answers that question in the negative does not alter the federal-state balance; it simply pre *554 serves for OCC the oversight responsibilities assigned to it by Congress. See id., at 22 (“Regulation of national bank operations is a prerogative of Congress under the Commerce and Necessary and Proper Clauses. The Tenth Amendment, therefore, is not implicated here” (citation omitted)).
Second, petitioner argues that a clear statement is required because “the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress,” Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230 (1947). There should be no presumption against pre-emption because Congress has expressly pre-empted state law in this case. See Altria Group, Inc. v. Good, 555 U. S. 70, 98 (2008) (Thomas, J., dissenting) (“[T]he presumption against pre-emption ‘dissolves once there is conclusive evidence of intent to pre-empt in the express words of the statute itself’” (quoting Cipollone v. Liggett Group, Inc., 505 U. S. 504, 545 (1992) (Scalia, J., concurring in judgment in part and dissenting in part))); ■ see, e. g., Riegel v. Medtronic, Inc., 552 U. S. 312, 315-316 (2008) (construing the express pre-emption provision of the Medical Device Amendments of 1976, 21 U. S. C. § 360c et seq., without any reliance on the presumption against pre-emption).
In any event, this presumption is “not triggered when the State regulates in an area where there has been a history of significant federal presence.” United States v. Locke, 529 U. S. 89, 108 (2000). National banking is the paradigmatic example. “In defining the pre-emptive scope of statutes and regulations granting a power to national banks,” this Court has taken the firm view that “normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted.” Barnett Bank of Marion Cty., N. A. v. Nelson, 517 U. S. 25, 33 (1996). As a result, federal legislation concerning national banks is “not normally limited by, but rather ordinarily pre-empt[s], contrary state law.” Id., at 32. As with general maritime law, *555 Congress’ “legislation] in th[is] field from the earliest days of the Republic” and its creation of an “extensive federal statutory.and regulatory scheme” mean that an “‘assumption’ of nonpre-emption is not triggered.” Locke, supra, at 108. That the States may also have legislated alongside Congress in this area, see ante, at 534-535, does not alter this conclusion, see, e. g., Franklin Nat. Bank of Franklin Square v. New York, 347 U. S. 373 (1954).
Last, petitioner argues that Chevron deference is inapplicable because OCC’s regulation declares the pre-emptive scope of the NBA. And, the majority flatly asserts that “[i]f that is not pre-emption, nothing is.” Ante, at 535. But OCC did not declare the pre-emptive scope of the statute; rather, it interpreted the term “visitorial powers” to encompass state enforcement of state fair lending laws. The preemption of state enforcement authority to which petitioner objects thus follows from the statute itself — not agency action. See Smiley, 517 U. S., at 744 (“This argument confuses the question of the substantive (as opposed to pre-emptive) meaning of a statute with the question of whether a statute is pre-emptive. We may assume (without deciding) that the latter question must always be decided de novo by the courts. That is not the question at issue here; there is no doubt that § 85 pre-empts state law” (emphasis in original)).
Here, Congress — not the agency — has decided that “[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law.” 12 U. S. C. § 484(a). Indeed, the majority agrees that it is the “statutory term” — and not OCC’s regulation — that “define[s] and thereby limit[s] the category of action reserved to the Federal Government and forbidden to the States.” Ante, at 535. As a result, OCC has simply interpreted that term to encompass petitioner’s decision to demand national bank records and threaten judicial enforcement of New York fair lending laws as a means of obtaining them. As Smiley showed, a federal agency’s construction of an ambiguous statutory term may clarify the *556 pre-emptive scope of enacted federal law, but that fact alone does not mean that it is the agency, rather than Congress, that has effected the pre-emption.
Petitioner’s federalism-based objections to Chevron deference ultimately turn on a single proposition: It is doubtful that Congress pre-empted state enforcement of state laws but not the underlying state laws themselves. But it is not this Court’s task to decide whether the statutory scheme established by Congress is unusual or even “'[b]izarre.’” See ante, at 529. The Court must decide only whether the construction adopted by the agency is unambiguously foreclosed by the statute’s text. Here, the text, structure, and history of “visitorial powers” support the agency’s reasonable interpretation of §484. Petitioner has not identified any constitutional principle that would require Congress to take the greater step of pre-empting all enforcement of state lending laws (including private enforcement) even though its central concern was the allocation of the right to exercise public visitation over national bank activities.
* * *
For all these reasons, I would affirm the judgment of the Court of Appeals.

 By looking to Justice Story’s concurrence in Trustees of Dartmouth College v. Woodward, 4 Wheat. 518 (1819), for authoritative guidance, see ante, at 526-527, the majority seemingly rejects the distinction between the visitor’s role in supervising civil corporations and the visitor’s far more limited role in supervising private institutions such as churches, universities, and charitable organizations. See ante, at 527, n. 1. In Woodward, the Court addressed the scope of the visitor’s authority over a private college — not a civil corporation. See 4 Wheat., at 562-563 (“The corporation in question is not a civil, although it is a lay corporation. It is an eleemosynary corporation. . . . Eleemosynary corporations are for the management of private property, according to the will of the donors. They are private corporations” (emphasis in original)). Visitors historically did not have “law enforcement power” over churches, universities, and charitable organizations. See supra, at 540-541. But there is strong evidence that visitors of civil corporations — i. e., sovereigns — were so empowered. See supra, at 541-542 and this page. The distinction between these species of visitation is crucial because it yields divergent understandings as to the scope of the visitor’s power to enforce generally applicable laws in court. Moreover, the majority’s failure to confront this important difference leaves a gap in its historical analysis that, in turn, undermines its conclusion that OCC’s interpretation of § 484(a) was unreasonable.

 Contrary to the majority’s conclusion, see ante, at 530, n. 3, petitioner’s structural argument is also undermined by the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 (Riegle-Neal), 108 Stat. 2338, which authorized national banks to operate interstate branches. The statute provides that “[t]he laws of the host State regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches shall apply to any branch in the host State of an out-of-State national bank to the same extent as such State laws apply to a branch of a bank chartered by that State” unless federal law separately pre-empts their application or the Comptroller determines that application of the state law would have a “discriminatory effect” on the national bank branch. See id., at 2349-2350, 12 U. S. C. § 36(f)(1)(A). Riegle-Neal further provides that “[t]he provisions of any State law to which a branch of a national bank is subject under this paragraph shall be enforced, with respect to such branch, by the Comptroller of the Currency.” See id., at 2350, 12 U. S. C. § 36(f)(1)(B). The United States has interpreted the “shall be enforced” language to provide OCC with exclusive enforcement authority. See Brief for Federal Respondent 46-48. This construction reinforces OCC's interpretation of § 484(a). If OCC has exclusive authority to enforce state law with respect to interstate branches of national banks, it would be reasonable to interpret the statute to operate similarly with respect to the national banks themselves.

 The majority’s suggestion that the Court’s decision in First Nat. Bank in St. Louis v. Missouri, 263 U. S. 640 (1924), is not “authoritative” falls short of the mark. See ante, at 528, n. 2; see, e. g., ante, at 529 (“[Rjeading ‘visitorial powers’ as limiting only sovereign oversight and supervision would produce an entirely commonplace result — the precise result contemplated by our opinion in St. Louis”). According to the majority, irrespective of which party has the better reading of that case, it “would still stand for the proposition that the exclusive federal power of visitation does not prevent States from enforcing their law.” Ante, at 528, n. 2. But that conclusion rests on the assumption that the St. Louis Court shared the majority’s conception of law enforcement and visitation as categorically distinct for purposes of § 484(a). It is impossible to verify that assumption, however, because the bank never raised the “visitorial powers” defense in that ease. See Reply Brief for Petitioner 6. If the Chevron doctrine is to have any interpretative value, an agency’s construction of a statute cannot be foreclosed by a prior judicial decision in which the provision in question was neither raised by the parties nor passed upon by the court.

 The majority contends that Watters is “fully in accord with the well established distinction between supervision and law enforcement.” Ante, at 528. But this argument ignores the reach of the statutes that the Court assumed were visitorial in Watters. The Michigan laws at issue in Watters allowed for much more than “ ‘general supervision and control’ ” of the operating subsidiaries of national banks. Ante, at 528. They also included provisions permitting the state attorney general to “take any appropriate legal action to enjoin the operation of the business” and allowing the commissioner “[t]o bring an action in ... circuit court in the name and on behalf of this state” to enjoin “any unsafe or injurious practice or act in violation of this act or a rule promulgated under this act.” §§ 445.1661(e), 493.56b.